Francis H. EDWARDS, Plaintiff-Respondent,

v.

FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Defendant-Appellant.

No. 32335.

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1966.

Motion for Rehearing or for Transfer to Supreme Court Denied Jan. 17, 1967.

Application to Transfer Denied Feb. 13, 1967.

Thomas F. McGuire, City Counselor, Aubrey B. Hamilton, Associate City Counselor, St. Louis, for appellant.

N. Murray Edwards, St. Louis, Martin Schiff, Jr., Clayton, for respondent.

TOWNSEND, Commissioner.

Acting under the authority of Sections 87.120–87.370, V.A.M.S., the City of St. Louis instituted a contributory system for the pensioning of members of its fire department and of the dependents of deceased members. Revised Code, City of St. Louis, 1960, Sections 335.010–335.650; Ordinance No. 50707 (1961). The ordinances provide for two types of retirement allowances—one on account of service upon reaching age 60 or after twenty years of service and the other on account of physical or mental disability. By appropriate formulae variant retirement allowances for disability are established, one for what is termed Ordinary Disability and the other for Service-Connected Accidental or Exposure Disability. The latter allowance is the larger. The system is administered by a seven-member Board of Trustees, which is given exclusive original jurisdiction of all claims for benefits. Its actions, decisions and determina-

tions are reviewable under the Administrative Procedure statutes, Chapter 536, RSMo.

On July 12, 1962, respondent, Francis H. Edwards, a captain in the St. Louis Fire Department, made application to appellant board for retirement allowance because of permanent incapacity for the further performance of duty, such allowance to become effective September 1, 1962. On July 23, 1962, respondent was advised by the chief of the fire department that he would be removed from the department's payroll on August 31, 1962. In separate communications, three physicians, members of the Board's Advisory Medical Board, advised the Board, after physical examinations of July 21, 1962, July 30, 1962 and July 20, 1962, respectively, that respondent was unfit for duty as a firefighter.

In his application for retirement allowance respondent attributed his disability to smoke inhalation on May 18, 1962 at 517 Antelope in the City of St. Louis. The Board considered the application, ex parte, on September 7, 1962, granted respondent retirement for ordinary disability but denied him retirement for Service-Connected Accidental Disability. The Board reaffirmed this position on October 31, 1962 after considering respondent's petition for review of its original decision. Thereafter respondent requested a hearing upon his application and this was at first denied on November 28, 1962, and then granted on December 28, 1962. The hearing was set for January 30, 1963, but was rescheduled from time to time owing to a variety of causes—inability of counsel, first on one side and then on the other, to be present, respondent's request for

continuances, respondent's refusal to proceed when less than the entire membership of the Board was present, intervention of vacation periods, illness of counsel, inability of witnesses to appear. Eventually the hearing was held on January 31, 1964.

Respondent's statement of the cause of his disability was amended on June 4, 1963, to "Smoke inhalation while fighting fires on May 18, 1962 at 517 Antelope and 8220 North Broadway, and exposure while in the actual performance of duty." Respondent was 64 years and three plus months of age on May 18, 1962.

On May 29, 1964, the Board made its "Findings, Conclusions and Order" which, after a finding as to respondent's period of service as a fireman, recited

"(2) The Board finds there is no causal connection between the present physical condition of Francis H. Edwards and any accident, event or exposure occurring while in discharge of his duty as a Fireman.

(3) The Board concludes that Francis H. Edwards is not entitled to Service-Connected Accidental Disability Retirement Benefits, and his claim therefor, is accordingly denied." [1]

Respondent thereupon filed his petition for review in the Circuit Court of Montgomery County, then the county of his residence, under the terms of Chapter 536, V.A.M.S. The Circuit Court found:

"3. That the letters of doctors Davidson, Rader and Conrad, although hearsay, were of some 'probative value', and since they were received without objection, should be

---

[1]. The relative ordinance provides:
 "Upon application by the member or the chief of the fire department any member, who has become totally and permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty or exposure while in the actual performance of duty in response to an emergency call shall be retired by the board of trustees, if the medical board shall certify that the member is mentally or

physically incapacitated for further performance of duty, that such incapacity is likely to be permanent and that the member should be retired. If the accident occurred prior to age sixty, application for benefits must be made before age sixty, except that the interval between the date of accident and of application must be at least six months." (Sec. 335.-280, identical with Sec. 87.200, RSMo, enacted Laws 1961, p. 214).

considered (Section 536.070(8) RSMo as amended Laws 1957, page 748), but that without further amplification and explanation, they were equivocal and unsubstantial, and that the action of the Board was, therefore, unsupported by substantial evidence upon the whole record.

4. That a finding in favor of Petitioner is amply supported by competent and substantial evidence.

5. That the order of the Board should be reversed with directions to enter its order finding that Petitioner became totally and permanently incapacitated for duty as the natural and proximate result of exposure while in the actual performance of duty in response to an emergency call on May 18, 1962 and is entitled to Service-Connected Accidental and Exposure Disability Retirement Benefits." The order of the Court in accordance with these findings was then entered. This appeal followed.

At the hearing before the Board of Trustees the respondent testified to the following effect:

On May 18, 1962, at about 5:18 a. m., his company responded to an alarm and proceeded to the Baden Hotel, 8220 North Broadway, where a mattress was afire on the third floor. Smoke was rolling out of the room and respondent ran upstairs and crawled to the location of the mattress. After he had wetted it down two firemen pulled the mattress downstairs and respondent followed, putting out fire which dropped from it. He then returned to the third floor and the rest of the fire was extinguished. The smoke in the room was very thick, black and hot. After returning to the ground level respondent was directed by the Chief to "take a look at that fire up there" and so respondent traveled to the third floor a third time. He estimated the period of time during which he was subject to smoke inhalation at ten to fifteen minutes. He used no gas mask during the period of this fire. Returning to the engine house respondent and his company were back in service only one minute when they

were called out to go to 517 Antelope at 5:51 a. m. At the latter address—a one and a half story house, respondent saw smoke upon his arrival and was informed by a woman at the back door that "My son's up there." He ran up the steps and found that the fire was very hot and smoky —another mattress fire. Crawling on hands and knees respondent found the son lying on the floor, dragged him to the steps and down and delivered him to his mother. Respondent then ran back up the steps to open a window and to put out the fire with a booster line which he had called for when he first went upstairs. He broke out the window and then got some fresh air. After getting his breath he had pain in his arm and chest and his heart was "pumping real hard." He felt like he was "going to go out" and so went back to the steps, where he lost consciousness. He came to in the hospital. He described the second fire as black and hot with lots of gas and cutting to the lungs. He estimated that he was exposed to heat and gases at the second fire for about twenty minutes. He had been in very smoky fires before and generally the effect would wear off in a few days. He had never had fires come this close together before. He was discharged from the hospital on May 21 and went home where he remained in an air conditioned room for a week. After that he went to his own physician, Doctor Schmidt, who treated him every week for a while and after that every two weeks. At the time of hearing he had been seeing Doctor Schmidt every two weeks. For the first two or three months following the fires respondent had pain in the chest and arm and pressure there; his lungs were sore. At the time of the hearing he still had the pain and the pressure and his lungs were sore. During his service respondent had gone to many mattress fires and many during his last year of service but never any as close together as those described. From 1959 through May 18, 1962, respondent carried out his duties in the fire department without any difficulties in responding to

fires, with no pain or shortness of breath through that period. As captain he was the "gang leader," going first into fires with his men following him. In the course of such duties it was sometimes necessary to run and physical exertion was necessary in dragging things out of fires and in getting hose and water into place. During April 1962 his company laid 12,000 feet of hose and was on fire duty twenty-four hours. Except for flu he did not miss a day of work in the 1959-May 18, 1962 period. During this time he was taking medication "for cholesterol" and his weight was reduced.

Other firemen present at the two fires and the householder at 517 Antelope corroborated respondent's story as to the principal incidents of the two fires, including the character of the smoke, the rescue at 517 Antelope, the other activities of the respondent at each fire and his incapacitation.

Respondent had collapsed at a fire in 1932 but never in the years between 1932 and 1962. In recent years he had never been hospitalized for smoke inhalation.

Captain Maniaci, who was in charge of the hook and ladder crew while respondent managed the pumping crews in responding to fire calls, testified that from the first of the year 1962 he observed respondent handling his regular duties and that "I would say he was very capable of handling himself at all times."

Upon cross-examination respondent stated that in 1959 he was in the veterans' hospital where he had sought admission because his left hip and leg bothered him and he was short of breath. He was asked: "You had a heart condition too at the time?" Answer: "Yes, hardening of the arteries, I believe." Q: "You went in because of trouble with shortness of breath also?" A: "Yes." Q: "Did you notice this shortness of breath before you went in the hospital when you were working on the department?" A: "A little bit, yes. The doctor said I had too much fat then." Q: "Did you have trouble with your heart and shortness of breath after 1959 and before 1962?" A: "No, my record shows only—hadn't missed a day only for flu." Upon redirect examination, respondent testified that from 1959 through May 18, 1962, he carried out his duties in the fire department, experienced no difficulty in responding to fires and had no pain or shortness of breath in that period.

The clinical record of respondent at the veterans' hospital was later introduced. The narrative summary shows that about six weeks before admission respondent ran upstairs to answer the telephone and was so short of breath he could hardly talk. At that time he had a sharp substernal pain for a few seconds. This same type of pain recurred the day before admission along with shortness of breath when climbing stairs. An electrocardiogram on October 21, 1959, was within normal limits but another taken on October 30, 1959 showed abnormal response to exercise. The summary concluded with the following diagnosis:

1) Arteriosclerotic heart disease
 Anginal syndrome
 Functional Class II —Treatment—Improved.

2) Obesity due to excess of food —Treatment—Improved.

3) Calcification of ligaments attached to the ischial tuberosity, left —Treatment—Improved.

4) Arteriosclerosis, generalized —Untreated—Unchanged.

The members of the Board's advisory medical board examined respondent and in succession, found him, separately, not "capable of carrying on his duties as a firefighter and should be retired," "completely unsuitable for a firefighter" and "totally and permanently disabled as far as carrying out the duties of his job." Each examiner reported in more or less detail his findings of respondent's physical condition which led to such his conclusion. Those findings which have relation to the subject of causation were as follows:

Doctor Rader—"Suffering from mild hypertensive arteriosclerotic heart disease, angina pectoris and to have marked exertional dyspnea. In addition to this he has cardiomegalia of several years standing."

Doctor Davidson—"Is in mild right sided congestive heart failure, the exact etiology of which is not apparent at this time * * *. Chest X-ray revealed a minimal left ventricular enlargement with a prominent apical fat pad, tortuous elongated aorta without calcification * * *. It is unlikely that the underlying disease process is caused by his smoke inhalation, but rather that the strenuous exercise and diminished oxygen supply on May 18 precipitated the onset of congestive heart failure."

Doctor Conrad—"This patient shows evidence of mild right-sided congestive heart failure even though he is on apparently a full maintenance dose of digitalis." Electrocardiogram considered to be within normal limits. Difficult to outline the heart by percussion but it does not appear to be enlarged. However "X-ray of the chest revealed slight left ventricular enlargement with an elongated tortuous aorta * * *." "I do not believe that the condition can be ascribed to the injuries in question. That is, the two episodes of exposure to smoke. Certainly the pulmonary emphysema and right-sided congestive failure were present prior to this time and the two episodes in question precipitated the symptoms but did not cause the condition."

Respondent's medical witness, Dr. James C. Redington, Jr., saw respondent for the first time on May 24, 1963. The history recorded by Doctor Redington is in accord with the testimony of defendant and the examiner had available the record from the city hospital, including X-rays and cardiac examination. He found that respondent's breathing was not normal, more shallow, and concluded that this condition was related to emphysema. The heart was enlarged; angina pectoris, pain in the chest caused by insufficient supply of blood to the heart, was suggested. He concluded that respondent had arterial heart disease with symptoms precipitated by activities on the day of the fires. "He had an onset of heart trouble which would be described as failure of the heart, I would say, and chest pain due to lack of blood supply to the heart * * *. This kind of heart disease is chronic deterioration of arteries to the heart and it cannot keep up with the activities of younger life for this is something men get after they get older and the type of thing he did that day caused him to have these symptoms * * *." In explanation of his use of the word "precipitated", he said: "I mean a man who had gone along with the symptoms and suddenly because of something he did that day he developed suddenly symptoms he did not have before that for some time. I want to make clear when you say a thing is precipitated the basic condition of the heart is there. The fact he had developed trouble was due to what he did that day. This would be true whether it was working or anything a man went out and did, some situation would result and this trouble was due to what he did * * *. I would say the events he described which had occurred that morning in May 1962 would be a cause of the clinical trouble and that was what resulted in his symptoms."

Adverting to the record of the Veterans' Administration hospital which recorded that after exertion the respondent's electrocardiographic tracing became abnormal, Doctor Redington testified: "This would

mean to me—as an internist this would mean to me a man functioning under ordinary activity, I would tell him to be careful. He could do a certain amount of work, but by putting himself in heavy stress, this would damage his heart." Referring to the four-part diagnosis found in the veterans' hospital clinical record summary, the witness was asked: "What would be the type of physical condition at that time that would result in that type of diagnosis based on that history?" His answer was: "That would mean to me, as I reviewed that, that he had some kind of chest pain due to arteriosclerotic heart disease at that time. From what you read in the summary there, I would conclude that after that exertion he mentioned there he had some kind of pain which they felt was due to angina pectoris from his heart * * * I could say from this functional Class II they mention, that a person with that can be held in Class I. If in Class II— he could perform ordinary activities, but if he would have pushed, would be pushed to severe stress and exertion he would have trouble * * *. I would say if a Class II patient at that time that I would tell him to avoid heavy exertion and work." Question: "As a doctor, you would not expect him to run up to a third floor room and do a lot of work or exert himself or lift something shortly after that running upstairs had occurred earlier that day?" Answer: "If I felt a person with this trouble was a Class II type patient, I would tell him not to run upstairs." Question: "You would tell him that because if he had that type of trouble he could develop a heart failure?" Answer: "Yes, he had the potentiality there."

Further examination of Doctor Redington produced the following questions and answers, among others:

"Q. Let me put my question again and this is a general question not related to any particular individual. Is it true that if you have a degree of arteriosclerotic heart disease that it can develop into a disabling condition or heart failure without any exertion?

A. Yes, that is possible.

Q. It would seem that whenever he had an exertion type of activity it would tend to worsen this condition. Is that something general?

A. Yes * * * you could have. It depends on the degree of exertion and degree of trouble he has, and not where you could say climbing one more flight of stairs would do this much more damage.

(Examination by a member of the Board)

Q. He had this before May 18, 1962, but became aware of it then?

A. Yes, but he became aware of it then because of serious symptoms he never had before.

Q. But he had shortness of breath and pains back in 1959?

A. Yes, but not the serious symptoms he had that day.

Q. So this is something all of us could have and not know about it?

A. If one day you are functioning normally and another day couldn't breathe and couldn't go on with your normal duties, there has to be some precipitory cause and I concluded this was due to severe exertion and the exertion described to me I would consider severe exertion."

* * * * * *

Being referred to the 1959 veterans' hospital record, Doctor Redington stated: "It says on the physical examination no enlargement of the heart, which is a pretty good thing, and on the x-ray findings they say no conclusive radiographic abnormality was demonstrated in the chest. Let me say in explanation—In 1959 they said no enlargement of the heart and the electrocardiographic tracing was within normal

limits. If we went no further we could say no heart trouble at all. But they went further and did a stress test and concluded there was something wrong with the heart. At rest it was normal."

At the conclusion of testimony before the Board, counsel for the Board offered numerous exhibits which were received without objection by respondent. These exhibits included, inter alia, various fire department and police reports relating to the fires of May 18, 1962, hospital reports relating to respondent's admission and presence with physician's medical report therein, reports of respondent's personal physician to fire chief's office and to the Board, individual letter reports by the three members of the Board's advisory medical board relating to examinations of respondent and 1959 Veterans Administration hospital record of respondent. Such exhibits are part of the transcript lodged with the Circuit Court upon respondent's petition for review. At the hearing in the Circuit Court respondent objected to the exhibits, "on the grounds they are hearsay." Objection was directed particularly to the letter reports of physicians to the Board; counsel further put his objection in this form: "I want that to show that the objection will go to the unsworn statements and letters that were in that record, that are not admissible as a question of evidence in this, of the proof in this case. I want to make that record objection at this time."

Our first consideration is the scope of judicial review in such a case as the present one. Section 22 of Article V of the Missouri Constitution, V.A.M.S., provides for direct judicial review, as provided by law, of the decisions, findings and orders of administrative bodies acting in a judicial or quasi-judicial capacity. The section requires that " * * * such review shall include the determination * * * in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record."

The Administrative Procedure act provides that, upon review: "1. The court shall hear the case without a jury and, except as otherwise provided in subsection 4 of this section, shall hear it upon the petition and record filed as aforesaid."

"2. The inquiry may extend to a determination of whether the action of the agency * * *

(3) Is unsupported by competent and substantial evidence upon the whole record; * * *."

 It is well established by the decisions of our appellate courts that a reviewing court may not substitute its own judgment on the evidence for that of the administrative body whose proceedings are under review. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Thacker v. Massman Construction Co., Mo. Sup., 247 S.W.2d 623; Carroll Construction Co. v. Kansas City, Mo.App., 278 S.W.2d 817; State ex rel. Bond v. Simmons, Mo. App., 299 S.W.2d 540. "But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence." Wood v. Wagner Electric Corp., supra. In passing upon the question of substantial and competent evidence the court is required to view the evidence in the light most favorable to the decision of the tribunal, giving to the decision the benefit of all reasonable inferences to be derived from the evidence produced. Merriman v. Ben Gutman Truck Service, Inc., Mo.Sup., 392 S.W.2d 292; Enyard v. Consolidated Underwriters, Mo. App., 390 S.W.2d 417. Where the evidence before the administrative body would warrant a finding either of two opposed ways the reviewing court is bound by the tribunal's findings and "it matters not that there may be evidence which would support a finding" to the contrary. Doughton v. Marland Refining Co., 331 Mo. 280, 53 S.W.2d 236; DeMoss v. Evens & Howard

Fire Brick Co., Mo.App., 57 S.W.2d 720; Buchanan v. Nicozisis, Mo.App., 78 S.W.2d 492. And see Gleason v. Titanium Pigment Co., Mo.App., 93 S.W.2d 1039. And, of course, the determination of the credibility of witnesses is a function of the administrative body.

The decision of the Board of Trustees was a negative one which necessarily included a finding that respondent's condition when he retired was not "the natural and proximate result of an accident occurring while in the actual performance of duty or exposure while in the actual performance of duty." Therefore it is obvious that that condition was attributed to other causes. Counsel for the Board maintains that there was substantial and competent evidence of such other causes; to that contention our attention must be directed.

It has been indicated how, at the end of testimony, counsel for the Board introduced numerous exhibits to which no objection was made. Counsel for respondent at this point emphasized certain portions of two of the exhibits by dictating for the record quotations from those exhibits. He then stated: "The taking of evidence at this hearing is now completed." At the hearing in the Circuit Court respondent objected to "those exhibits" on the grounds that they were hearsay, with special emphasis on the reports of the medical advisory board, "never sworn to", whose makers were not brought into the hearing before the Board as witnesses. Opposing counsel maintained that the exhibits were competent evidence because no objection to them was made and because they were "all handed to it [the Board] and presented to it in the regular course of its operations."

Respondent presents us with a line of cases holding that, whether the issue is one of substantial and competent evidence or not, hearsay evidence does not constitute substantial and competent evidence even though it was admitted by the administrative body without objection being made thereto. We do not believe that such a rule

can have application to the exhibits here—especially not to those exhibits to which special exception is made, namely, the reports of the Board's medical advisory board.

Section 335.160, Revised Code of St. Louis (identical with Section 87.160(2), V.A.M.S.) provides:

"The board of trustees shall designate a medical board to be composed of three physicians who shall arrange for and pass upon all medical examinations required under the provisions of this Chapter [87.-120–87.370 of the statutes], shall investigate all essential statements and certificates made by or on behalf of a member in connection with an application for disability retirement and shall report in writing to the board of trustees its conclusions and recommendations upon all the matters referred to it."

■ The reports of the medical examiners are records required by law to be made to the Board and so constitute public records; as such they are competent evidence to establish such facts as the law requires to be kept. Woods v. National Aid Life Assn., Mo.App., 87 S.W.2d 698. Such records are admissible without the aid of any statute saying that they should be admitted. Galli v. Wells, 209 Mo.App. 460, 239 S.W. 894. See Gurno v. Janis, 6 Mo. 330. Being competent evidence they are removed from the category of hearsay evidence, or if one is interested in an alternative type of verbalization, one can become conventional and say that they are an exception to the hearsay rule. In any event, being competent they cannot be characterized as incompetent.

Respondent's medical witness testified as to the medical history recited to him by respondent; at that time he also consulted the records of the city hospital relating to respondent and arrived at his conclusion regarding the nature of respondent's disability. The subject of the Veterans Administration hospital record was opened up on direct examination. The witness testi-

fied as to the content of certain parts of those records and had the benefit of photostats of the records when examining respondent. On cross-examination, counsel without objection read from the report that portion of the summary designated as diagnosis, which embodied (as heretofore stated) the findings relating to arteriosclerosis, and questioned Doctor Redington as to the kind of physical condition which would lead to that type of diagnosis; this brought the reply: "That would mean to me, as I reviewed that, that he had some kind of chest pain due to arteriosclerotic heart disease at that time." Upon cross-examination respondent had previously testified concerning his admission and residence in the veterans' hospital in 1959, that he had "hardening of the arteries" at that time and that he "went in because of shortness of breath also."

Thus, we have before us definite evidence that in 1959 respondent had arteriosclerotic heart disease and shortness of breath. The action of his heart when he was at rest was within normal limits, but after exercise it showed an abnormal response. The development of arteriosclerosis is part of the aging process and is progressive in its nature. After a degree of arteriosclerosis has been established, in the normal course of events the condition will worsen as time goes on. It is possible for such a condition to develop heart failure without any exertion. The veterans' hospital diagnosis meant to the respondent's medical witness among other things that respondent had some kind of chest pain due to arteriosclerotic heart disease,—that he would conclude that after exertion respondent had a kind of pain which the hospital examiner felt was due to angina pectoris from his heart. Doctor Redington testified further that if a patient were in Functional Class II, to which the veterans' hospital diagnosis assigned the respondent, he would advise

him to avoid heavy exertion or work, that if such a person were pushed to severe stress or exertion he would have trouble; if he was in the condition stated he could develop a heart failure because he "had the potentiality there." "I want to make clear when you say a thing is precipitated the basic condition of the heart is there."

■ From the testimony of respondent's medical witness we believe that the Board could reasonably infer that respondent's arteriosclerotic condition worsened in the two and one half year period between respondent's departure from the veterans' hospital and the date of the fires. In the light of Doctor Redington's testimony it could reasonably be inferred that the right-side congestive heart failure as found in the reports of Doctors Conrad and Davidson (August 6, and August 3, 1962) resulted from the 1959 arteriosclerotic condition. Doctor Conrad of the medical advisory board expressed the belief that the disabled condition of respondent after the fires could not be attributed to the two episodes of fire and smoke. Doctor Rader expressed no opinion on that subject and Doctor Davidson stated that it was unlikely that the underlying disease process was caused by smoke inhalation.

Such evidence with the inferences reasonably to be drawn from it cannot be regarded as insubstantial. As the Board by its findings in the case obviously attributed respondent's disabling condition (which was undisputed) to some cause or causes other than respondent's experience at the two fires, we find that the detailed evidence affords sufficient substantial and competent evidence to support the findings and order of the Board.[2] In view of the responsibility rested in the Board to weigh the evidence before it and to determine the credibility of witnesses, we cannot say that its findings are contrary to the overwhelming weight of the evidence.

2. It may be noted that under the ordinance the disabling condition which qualifies an applicant for the larger retirement allowance must result from an accident or exposure. Incapacitation because of disease is not covered by the relevant ordinance section.

The judgment of the circuit court is reversed and the order of the Board of Trustees of Firemen's Retirement System of St. Louis is affirmed.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, the judgment of the circuit court is reversed and the order of the Board of Trustees of Firemen's Retirement System of St. Louis is affirmed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.