**MARSHFIELD COMMUNITY BANK,**
Plaintiff-Respondent,

v.

**STATE BANKING BOARD of Missouri,**
Defendant-Appellant,

Citizens State Bank of Marshfield, Missouri,
Intervenor-Appellant,

Seymour Bank and Pleasant Hope Bank,
Intervenors-Appellants.

Nos. 9240, 9241 and 9244.

Missouri Court of Appeals,
Springfield District.

May 3, 1973.

Motion for Rehearing or to Transfer to the
Supreme Court Denied May 30, 1973.

Application to Transfer Denied
July 16, 1973.

E. C. Curtis, L. J. Knauer, Farrington, Curtis & Strong, Springfield, for plaintiff-respondent.

John C. Danforth, Atty. Gen., Charles A. Blackmar, Asst. Atty. Gen., Jefferson City, for defendant-appellant State Banking Board of Missouri.

Robert W. Spangler, Crouch, Crouch, Spangler & Douglas, Harrisonville, for intervenor-appellant Citizens State Bank of Marshfield.

Warren S. Stafford, Thom G. Field, Neale, Newman, Bradshaw & Freeman, Springfield, Elvin S. Douglas, Douglas & Douglas, Bolivar, for intervenor-appellant Pleasant Hope Bank.

COTTEY, Special Judge.

We have for decision a question requiring the construction of several sections of the banking laws of the state and a review of some procedural aspects of their administration. The case has reached us by a progression of steps taken under circumstances on which it will be appropriate to comment as we go along, by way of background for the later discussion of the issues:

■ 1. In 1967 the incorporators of a proposed new bank—the Marshfield Community Bank, respondent here—applied to the Commissioner of Finance for a charter to engage in the general banking business in Marshfield, in Webster County. There were ten established banks in, or on the periphery of, Webster County at the time, (exclusive of those in Springfield, twenty miles distant from Marshfield), which served all or overlapping parts of the trade area in which the new bank was scheduled to operate, and seven of them—including those named as appellants here—were opposed to the issuance of the charter. The proceedings before the Commissioner in cases of this kind, however, are purely ex parte. Objecting banks are not accorded the status or even the title of "parties;" no method is provided for them to resist the charter in any conventional way.[1]

---

1. No provision is made for them to appear and produce witnesses at an evidentiary hearing before the Commissioner on the merits of the case. Nor are any rules prescribed for evaluating the material otherwise assembled for the Commissioner's guidance—parts of which, like the reported comments of local businessmen, are pure hearsay; parts of which, like the organizers' estimates of the new

2. Upon the filing of the application it became the duty of the Commissioner, under § 362.030(1), RSMo 1969, V.A.M.S., to "cause an examination to be made to ascertain," (among other things), "if the convenience and needs of the community to be served justify and warrant the opening of the bank." [2] That is the ultimate fact to be found—the essential requirement in every case as a condition precedent to the chartering of a new bank. And it follows by logic, indeed by all conventional rules, that the burden of proving that fact rests on the proponents of the charter at all stages of the proceedings.[3] The Commissioner did his duty; he caused the required examination to be made, not once but twice.

3. The report of the first investigation, completed in 1969, concluded with this finding: "The conditions are considered to be unsatisfactory. . . . [T]he needs of the community and surrounding trade area are being served by the existing bank[s]." No action was taken on that report, however. Instead, a new examination was ordered to be made—by a different examiner. The report of it, although ambivalent in some respects and challenged for accuracy in others, was on the whole favorable. Accordingly the Commissioner,

in the exercise of the discretion vested in him by § 362.035, RSMo 1969, V.A.M.S., issued the charter to respondent on May 11, 1971.

4. The dissident banks applied to the State Banking Board for a review of that decision, as they were authorized to do by §§ 361.094(2) and 361.095(3), RSMo 1969, V.A.M.S. Since the statutes and rules relating to such a review bear directly on the issues before us, it will be well to notice them here and to make some observations on them that may be helpful in analyzing our later application of them in this case. To begin with, the Legislature created the Banking Board and invested it with jurisdiction to "hear and by order determine an appeal from the action of the commissioner granting the incorporation" of a new bank, and directed that the Commissioner "shall act in accordance with any order" made by the Board pursuant to that authority. §§ 361.092, 361.094(2), and 361.-095(4), RSMo 1969, V.A.M.S. On appeal from the Commissioner's action, the Board is authorized to subpoena witnesses and administer oaths and compel the production of any documentary evidence deemed pertinent to the inquiry, and is directed to "make rules and regulations, consistent with applicable law, for the proceedings in

---

bank's prospective profits, are largely the froth of optimism; and all of which, lacking the tests of cross-examination and informed doubt, offers some likelihood of being received at the assay claimed for it by its producers.

2. The clause immediately following this quoted part of the statute adds a refinement to the required finding, in this language, "and if the probable volume of business in such locality is sufficient to insure and maintain the solvency of the new bank . . . and the solvency of the then existing banks . . . in the locality, without endangering the safety of any bank . . . in the locality as a place of deposit of public and private moneys." We do not regard that supplemental statement as prescribing a second and independent finding which the Commissioner is required to make, but rather as an integral part of the first; for it could hardly be said that a new

bank would serve the convenience and needs of its prospective trade territory if its opening endangered the solvency of the area's established banks or uselessly impeded their opportunities for expanded service—and especially so if its competitive activities were likely to be conducted at risk of its own solvency and hence at hazard to the public. For brevity, therefore, we will treat this aspect of the question in the ensuing discussion as being implicit in the issue of "convenience and needs."

3. Whoever has the obligation of complying with a condition precedent must not only allege compliance, Globe American Corp. v. Miller Hatcheries, 110 S.W.2d 393, 396 (Mo.App.1937), but prove it affirmatively. Baerveldt & Honig Const. Co. v. Szombathy, 365 Mo. 845, 852, 289 S.W.2d 116, 120 (1956); Brush v. Miller, 208 S.W.2d 816, 820 (Mo.App.1948).

connection with" such appeals. §§ 361.096, 361.095(1), RSMo 1969, V.A.M.S. The decision of the Board is "subject to judicial review as provided by law." § 361.095(4), RSMo 1969, V.A.M.S. The right of *appeal* to the Board is granted to any bank "claiming to be adversely affected" by the Commissioner's decision. § 361.094(2), RSMo 1969, V.A.M.S. And an alternative and essentially indistinguishable right *to intervene* on any such appeal is likewise granted, in the same language, to any bank "claiming to be adversely affected" by the Commissioner's action. § 361.095(3), RSMo 1969, V.A.M.S. Two of the dissident banks in the case at hand elected to appeal from the Commissioner's decision; the remaining five chose to intervene on that appeal.

5. The review by the Board was made in due course. It was a de novo hearing on all of the objections raised by the dissident banks, whether as appellants or intervenors—an evidentiary hearing on the merits of the case conducted by conventional rules. The result of it was that the Board reversed the Commissioner and revoked respondent's charter by its order of July 14, 1971, which recited, "That the record and evidence adduced does not support a finding that the convenience and needs of the community to be served justify and warrant the issuance of a charter to the applicant Marshfield Community Bank." Respondent professes to find some ambiguity in that language. We see none. Beyond doubt, in the view the Board took, the proponents of the charter simply failed to sustain their burden of proof on the pivotal issue of "the convenience and needs of the community to be served."

6. Disappointed by that result, respondent applied to the Circuit Court of Webster County for a judicial review of the Board's decision—and the case took a new turn. Based on a review of the record compiled before the Board, the circuit court made a two-part finding: 1) "that the State Banking Board acted in excess of its authority in that its decision was based upon a ground and finding not included in the grounds upon which the appeal to the Board was taken," and 2), that the Board's decision "was arbitrary, capricious and unreasonable" because the "evidence clearly shows that the convenience and needs of the community to be served do justify and warrant the issuance of the charter." Accordingly, the court reversed the Board and reinstated respondent's charter by its order of January 20, 1972. The case comes to us by consolidated appeals from that ruling.

The learned trial judge has not favored us with a memorandum opinion outlining the considerations that led him to that conclusion.[4] In support of it, however, counsel for respondent have marshalled an array of arguments and brought them on the field in this order:

A. To sustain the court's first finding —that the Board acted in excess of its authority by deciding the case on a ground not properly presented to it—a proposition of six parts is advanced: 1) that § 361.-094(2), RSMo 1969, V.A.M.S., requires a dissident bank's notice of appeal to "state the grounds upon which it is alleged that the action of the commissioner should be . . . reversed;" 2) that the requirement is jurisdictional and "could not possibly be waived;" 3) that the appealing banks wholly failed to comply with it because they prefaced every stated ground for their appeal with the assertion, "The Commissioner has failed to make an examination to ascertain," etc.—as, for pertinent example, "The Commissioner has failed to make an examination to ascertain and determine if the convenience and needs of the community to be served justify and warrant the opening of said Bank;" 4) that such an assignment raises only the question of whether an examination for

---

4. That omission, in a case of this novelty and complexity, leaves us somewhat in the position of having to pluck a porcupine in the dark.

that purpose *was in fact made*—nothing more; 5) that proof of the admitted fact that the Commissioner *had* caused the required examination to be made, not once but twice, put an end to the legitimate inquiry of the Board and dictated the result; hence 6) that in inquiring beyond the fact, and in delving into the merits of the case and in deciding on the basis of new evidence what the Commissioner's decision should have been, the Board "acted in excess of its authority." Three comments on that proposition occur to us:

 (1) It obviously depends for its persuasive effect on a strictly literal interpretation of the language used in the notice of appeal; but not since Portia's success with it has that approach enjoyed much favor in court. It is a fact of life that the art of precise expression is not generally practiced; examples of its lapse are daily before the courts to be dealt with. And out of necessity of doing plain justice in those cases a rule has evolved that has its roots in ancient wisdom, "The letter killeth, but the spirit giveth light." Guided by that precept, courts look to the intendment of language used, not to the inartificialities of its use. The Board evidently followed that policy in this case. Implicit in its decision is a finding that the wording of the notice of appeal did not obscure its purpose or meaning and, in spite of the awkward preface to its assignments, did not mislead respondent to its prejudice in any way. We approve.

██ (2) Essential to the argument is the assumption it makes that the quoted provision of § 361.094, RSMo 1969, V.A.M.S., was somehow waived by the Board, to the undeserved advantage of the appealing banks. There was no waiver. The statute does indeed require the grounds for appeal to be stated, but it does not prescribe the form of the statement or specify the language to be used; any reasonable effort at ordinary English will satisfy its requirements in that respect. And once the effort has been made, as it undeniably

was in this case, the adequacy of it becomes a matter of construction, not of waiver. The one involves the proper exercise of jurisdiction, the other the improper assumption of jurisdiction. There is no similarity between the two.

 (3) Even if respondent's proposition were sound it would not be controlling. This, because the Board by its Rules 4.01, 4.02 and 4.03, has adopted a policy of considering objections raised by *intervening* banks in the same way and to the same end as those raised by *appealing* banks, with the result that its decision may rest as comfortably on a complaint urged by the former as on a ground alleged by the latter—and in the case at hand the issue of "convenience and needs" was raised by the intervenors in language of such clarity that even respondent does not question its import. Viewed in the light of the Rules, that issue was clearly within the compass of the Board's inquiry. Respondent insists, however, that we may not resort to the Rules in aid of the Board's decision, for two reasons:

 (a) Because the Rules constitute an effort on the part of the Board to expand the scope of its statutory jurisdiction by its own act, and are therefore void; citing 73 C.J.S. Public Administrative Bodies and Procedure § 94, l.c. 415. A four-part argument is put forward in support of that conclusion: 1) that § 361.-094(2), RSMo 1969, V.A.M.S., requires *appeals* from the Commissioner's action to be perfected "within ten days;" 2) that this provision is jurisdictional and precludes the Board from entertaining the grievance of any dissident bank not presented within that time; 3) that the issue of "convenience and needs" was not raised by the intervening banks until after the expiration of that time; hence 4) the Board had no jurisdiction to consider it, and any rules designed to circumvent that result are a "complete nullity." We are not persuaded. Omitted from the rationale of the argument is the fact that it was the Legisla-

ture, not the Board, that provided the remedy of intervention for dissident banks *in addition to* the right of appeal which was equally available to them as a class—as banks "claming to be adversely affected" by the Commissioner's action[5]—and it was the Legislature, in the course of providing relief by both of those procedural methods, that vested the Board with jurisdiction to deal with both. §§ 361.095(3), 361.094(2), RSMo 1969, V.A.M.S. But nowhere did the Legislature fix a time limit for intervention, and nowhere did it undertake to restrict the issues that might be raised thereby. Those details were left to the discretion of the Board, to be regulated by rule. The Rules adopted to that end do not flout the legislative purpose, they implement it in a particular that is not only not prohibited by statute but encouraged on principle in the light of the fact that the public interest is at stake. Their evident purpose was to afford the widest latitude for the Board's consideration of every aspect of public concern, no matter by whom suggested or from what possibly selfish promptings.[6] In this respect they merely "fill in the interstices of the dominant enactment," 73 C.J.S. op. cit. supra § 94, 1.c. 415; and they do so in a way that is both permissible and commendable.

(b) Because the Rules are not "consistent with applicable law," as § 361.-

095(1), RSMo 1969, V.A.M.S., requires them to be, and are therefore void. The argument here is: 1) that it is a generally accepted principle of procedural law that intervenor "must take the case as he finds it," and may not "introduce a different and extraneous cause of action or an independent controversy," citing 59 Am.Jur.2d Parties, § 180, 1.c. 619–20, and General Ins. Co. of America v. Hercules Construction Co., 385 F.2d 13, 18 (8th Cir. 1967); 2) that the Board's Rules violate that principle by allowing an intervenor to inject in the case an issue not raised by the appeal —in this case, the issue of "convenience and needs;"[7] 3) that this conflict with "applicable law" invalidates the Rules and renders nugatory any decision of the Board made in reliance on them. Again, we are not persuaded. Overlooked in the fervor of the argument is the fact that in proceedings before an administrative tribunal the application of that principle is permissive, not mandatory. "It *may* be provided that an intervener is admitted to a proceeding as it stands . . . and is not permitted to enlarge the issues." 73 C.J.S. op. cit. supra § 119, 1.c. 439. (Emphasis ours). By clear implication, in the absence of such a provision the Board is at liberty to adopt a more liberal procedure, as it has done in this case. Even in proceedings before courts, as a matter of fact,

---

5. We need not speculate as to the reason for this duality of remedies; but a comment based on ordinary observation may be allowable. It often happens that rivals band together in a cause that is common to them all, but divide hopelessly on the methods of achieving its object. Many a worthwhile project has foundered on that reef; and not infrequently the cargo lost has been the public interest. It seems reasonable to suppose, then, that the Legislature, mindful of its duty to minimize that risk, intended by statute to mark out a second channel by which safe harbor could be reached; and the Board, by its Rules, has dredged it. If that be true, the plan and the method of its implementation ought both be approved.

6. The self-interest of the intervening banks in pressing the issue of "conveni-

ence and needs" is irrelevant; the public interest was served by it. When a thing is done that is generally beneficial, one does not look to its motive to criticize but to its result to commend.

7. Merged in the argument is the repetitive theme that the issue of "convenience and needs" was never raised by the appealing banks, but was only injected in the case by the other dissident banks on intervention. We have rejected that contention in paragraphs A(1) and (2) above. Nevertheless, we have decided to entertain this further presentation of it—not because it is essential to the disposition of the case, but because it is our occasional privilege to recognize in this way the skill and industry of able lawyers who regularly make the law that appellate courts so often claim credit for.

there are exceptions to the rule that are acknowledged in a later paragraph of the text cited as authority for it: "Most courts recognize that there may be cases in which an intervenor may be entitled to assert . . . claims adverse to those of any or all of the original parties, even though the exercise of the right involves the introduction of additional issues, where that is necessary to protect his interests, which will be concluded by the ultimate decision, and where such issues are consistent with and incidental to the objects and purposes of the suit. It is practically impossible for a third person to intervene in a pending action without presenting questions of fact not involved in the pleadings of the original parties. It should be sufficient ordinarily if the ultimate issue to be determined remains the same." 59 Am.Jur.2d op. cit. supra § 181, p. 621. In the case before us, if it can possibly be said that the issue of "convenience and needs" was only raised by the intervening banks, then it must surely be added: 1) that the introduction of that question was necessary to protect their interests which would otherwise have been foreclosed by the Board's decision; 2) that it was in no sense extraneous to the object of the proceeding, but entirely compatible with its legislative purpose; and 3), that a refusal to entertain it would have thwarted the public interest and subverted the whole intendment of the Act. Accordingly, we hold that neither in principle nor on precedent are the Rules in conflict with applicable law.

B. Further in support of the trial court's finding that the Board acted in excess of its authority respondent makes an analysis of the various statutes dealing with the duties and responsibilities of the Commissioner of Finance, and reaches this conclusion: 1) that the Commissioner "is the . . . 'agency' . . . within the Division of Finance who is vested with discretionary authority to grant or deny a bank charter;" 2) that his discretion in this matter may not be overridden except for palpable abuse; 3) that, in consequence, "the Banking Board may only review the action of the Commissioner and determine whether or not his action was supported by competent and substantial evidence or was arbitrary and capricious;" 4) that such a review would necessarily be confined to the record before the Commissioner on which he based his decision; hence 5) that "when the Banking Board purports to act beyond this function and to conduct a de novo hearing and to substitute its discretion for that of the Commissioner of Finance, it has gone entirely outside its jurisdiction and authority." And, for good measure, respondent adds that any contrary view "is a complete misconception of the banking laws of the State of Missouri." [8] We have our doubts:

(1) Nobody denies that the issuance of a charter to a new bank is, in the first instance, an exercise of the Commissioner's discretionary authority. But it does not follow that his discretion is inviolable save for such abuse of it as may be reflected by the records of his own office. To say so is to equate an appeal to an administrative tribunal with a "judicial review" by the courts. To confirm the

---

8. If it be a misconception, it is one shared by the courts generally. In Suburban Bank of Kansas City v. Jackson County State Bank, 330 S.W.2d 183 (Mo.App. 1959), and in Broadway National Bank v. Linwood State Bank, 456 S.W.2d 296 (Mo.1970), the point at issue required a review of proceedings in the Department of Finance that followed very closely the pattern of those in this case; and in each instance the court decided the question on the basis of the evidence before the Board, not the Commissioner, and in every respect treated the Board, not the Commissioner, as the agency vested with discretion to make the final decision at the administrative level. True, the argument made by respondent here was not discussed in either of those opinions; but considering that it was the duty of those courts to determine the scope and basis of their jurisdiction on appeal, whether objection to it was raised or not, the view they took of the question is at least persuasive.

analogy, consult the provisions of Chapter 536, RSMo 1969, V.A.M.S. If respondent has the right of it, why would the Legislature provide at all for an appeal to the Board when the same result would be accomplished under the same restrictive rule of review by simply allowing the appeal from the Commissioner's action to be taken directly to the courts? And if the Commissioner's decision is sacrosanct save for abuse of discretion, why did the Legislature require him to obey any order made by the Board on appeal, as it did by § 361.095(4), RSMo 1969, V.A.M.S., *without* imposing, either there or elsewhere, some commensurate restraint on the scope of the Board's review? And if the Legislature did not intend for the Board to decide the case on the basis of a de novo hearing, why did it authorize the Board to subpoena witnesses who never appeared before the Commissioner and compel the production of documentary evidence beyond that contained in the Commissioner's files? Is it possible that the Legislature labored under a misconception as to the import and effect of the laws it was enacting? Or, as the only alternative, must we assume that the Legislature, charged with the duty of protecting the public interest in these matters, was less interested in meeting that responsibility than in devising procedural stratagems for the evasion of it? There are no authorities on the subject to guide us; but common sense is an acceptable substitute. The argument here is apparently directed to a more exotic faculty.

■ (2) Respondent's insistently repeated assertion that the Board had no authority to extend its inquiry beyond a review of the files in the Commissioner's office—and was then limited to deciding only if the Commissioner's action on the basis of that information "was arbitrary or capricious"—prompts this final comment on the subject: The ex parte proceeding before the Commissioner in these cases does well enough, no doubt, where the issuance of the charter is not seriously opposed by the established banks in the community and

his assessment of the public's interest in the project is not challenged. But otherwise, otherwise. Opposition adds a new dimension to the problems. It is the right of everyone when his private interests are threatened, or when he speaks for the public on a matter of public concern, to be heard on the merits of his position. And even if that right were not Constitutionally guaranteed to him, the preservation and encouragement of it would be the first order of business for the Legislature and the paramount function of the courts in a democratic system. We must assume that the Legislature was mindful of its responsibility in that respect when it authorized the Board to entertain the grievances of any bank "claiming to be adversely affected" by the Commissioner' action. §§ 361.-094(2), 361.095(3), RSMo 1969, V.A.M.S. And we must assume that in the discharge of that responsibility, by those statutes and the others previously discussed, the Legislature intended to afford the dissident banks, for the first and only time, an opportunity to confront the proponents of the charter at an evidentiary hearing on the merits of the case, conducted by conventional rules before the Board as the designated forum for the hearing, to the end that all disputed issues might be fully considered and finally resolved at the administrative level on the basis of informed judgment. We approve the principle of that concept and its application in the case at hand.

C. That brings us to the trial court's second finding: That the "evidence clearly shows that the convenience and needs of the community to be served do justify and warrant the issuance of the charter." Two comments:

■ (1) Admittedly the record reflects some testimony which, if believed, would support that conclusion; but that is not the test. A reviewing court is not authorized to weigh the evidence on which the decision of an administrative agency is based and make its own appraisal of the merits of the case by its own standards,

and so to "substitute its discretion for discretion legally vested in the agency," uninhibited by the contrary mandate of § 536.-140(5), RSMo 1969, V.A.M.S. It may not, in bankers' language, put a premium on the losing party's evidence to the end that a different result may be borrowed on the strength of its enhanced value. The losing party's evidence must be received by the court at the discount placed on it by the administrative tribunal that decided against it, unless that discount is so palpably arbitrary that reasonable minds cannot doubt the injustice of it. And in passing on that point "the court is required to view the evidence in the light most favorable to the decision of the tribunal, giving to the decision the benefit of all reasonable inferences to be derived from the evidence produced. . . . And, of course, the determination of the credibility of witnesses is a function of the administrative body." Edwards v. Firemen's Retirement System of St. Louis, 410 S.W.2d 560, 567–568 (Mo.App.1966); 73 C.J.S. op. cit. supra § 216(b), p. 575. Realistically, then, the test is this: Was there "competent and substantial evidence upon the whole record, not contrary to the overwhelming weight of the evidence, to support" the Board's decision? Suburban Bank of Kansas City v. Jackson County State Bank, 330 S.W.2d 183, 184 (Mo.App.1959); Edwards v. Firemen's Retirement System of St. Louis, supra, 410 S.W.2d at 567; 73 C.J.S. op. cit.

supra § 220, p. 580. The trial court pointedly avoided that test in this case, however. Nowhere did it declare that the Board's decision was contrary to the overwhelming weight of the evidence, or that it was "unsupported by competent and substantial evidence upon the whole record." § 536.140, subd. 2(3), RSMo 1969, V.A.M.S. Nor does respondent make that claim at any point in its brief.[9] We are simply invited to weigh the evidence, as the trial court evidently did, and to conclude, as the trial court evidently did, that *on balance* respondent had the better of it. That we may not do.

 (2) Respondent does indeed say, at Point II of its brief, that the record supports "a finding that the convenience and needs of the community to be served by respondent do justify and warrant the issuance of a charter to respondent;" but the argument there made is altogether directed to the proposition that the evidence *before the Board* was sufficient to sustain the *Commissioner's* decision, and that it should therefore have been affirmed. We have explored the labyrinthine logic of that proposition in paragraphs B and B(1), above, and have nothing to add to the conclusion there reached. It nowise bears on the question at hand. We are here considering the propriety of the trial court's action in making an independent assessment of the record in the case and in reversing

---

9. The tacit concession implicit in those omissions relieves us of the necessity of extending this opinion by a recitation of the conflicting evidence before the Board or even of condensing the twenty page summary of it in appellants' brief, which our review of the record confirms as substantially accurate. Respondent contents itself with saying, "[W]e will not burden the Court with a review of this evidence." Very good; neither will we burden the reader with it. Suffice it to say that when a new bank is proposed for a rural community of negligible growth and wealth and with no immediate prospect for improving either, which is already served by ten or more existing banks within fifteen minutes' drive of any prospective patron, which boasts a ratio of banks to population that is twice that of eight counties adjacent to it, and whose largest bank can find no prudent outlet in local loans for more than about 50% of its lending capacity, there is bound to be some very persuasive evidence that the "convenience and needs" of the community do not require another bank. Add to that a showing, by opinion evidence, that the new bank's deposits would largely be drawn from the area's established banks, (with consequent implications), and that even with those gleanings it "could not and would not remain solvent," and would possibly become "insolvent in less than two years," and there can be no lingering doubt that the evidence before the Board amply sustained its decision.

the Board on the strength of it, not because the Board's decision was "unsupported by competent and substantial evidence," but because the evidence before the Board, in the court's view of it, preponderated in respondent's favor. The only argument advanced in direct support of that result is based on this circumstance: At the hearing before the Board the president of one of the appellant banks testified, "Our bank will lose some deposits, but not so much that we will be adversely affected," and a vice-president of another said, "I don't believe that it [the anticipated competition from the new bank] will affect our bank to any great extent." Citing that testimony, respondent says, "These statements, made by the managing officers of both appellants, are binding, judicial admissions on the part of each appellant." [10] The point urged is that the trial court, finding those statements in the record before it, was bound to regard them as judicial admissions and to accord them the conclusive effect that respondent ascribes to them and, consequently, to decide the case on the basis of them regardless of the other evidence. Not so. The cited statements do not rise to the dignity of judicial admissions by any standard. They are not statements of fact. Stockton v. Tester, 273 S. W.2d 783, 786 (Mo.App.1954); 31A C.J.S. Evidence § 299, l.c. 765. They are not even conclusions of fact which are sometimes admissible against the declarant's interest because of his presumed knowledge of the details of the occurrence to which they relate. Scherffius v. Orr, 442 S.W.2d 120, 125 (Mo.App.1969); Mayhew v. Travelers' Protective Ass'n of America, 52 S. W.2d 29, 31–32 (Mo.App.1932); 31A C.J. S. op. cit. supra § 272(b), l.c. 702. Here there had been no occurrence, no *fact* relating to it could possibly have been known; the witnesses were speaking of an event that lay altogether in future prospect, and their testimony amounted to nothing more than a calculation of the contingencies and uncertainties that might influence it and a prediction of its possible consequences. Estimates and opinions of that sort depend too heavily on guesswork, are too susceptive of miscalculation,[11] to be treated as binding admissions against the interest of the party on whose behalf they are volunteered.

D. We have disposed of the reasons assigned by the trial court for its holding that the Board's decision was "arbitrary and capricious." Respondent suggests one more, not mentioned by the court. The gist of it is that the Board's denial of a charter to respondent has the effect of fostering a monopoly of the banking business of the Webster County trade territory in the banks already established there, allowing them, as respondent puts it, "to grow fatter and fatter as the economy of their respective areas continues to grow," in arbitrary disregard of "the free enterprise system which has brought about the development and growth of America." That complaint lacks nothing in the fervor of its generalities; but where are the specifics to relate it to? "In an appeal of this character growing out of the exercise of the authority and powers of [an administrative agency] the burden is upon the party seeking to set aside the order of [the agency] to show by clear and satisfactory evidence that the order is unreasonable or unlawful." State ex rel. Dail v. Public Service Commission, 240 Mo.App. 250, 203 S.W.2d 491, 499 (1947). No such showing is made here. The cases cited by respondent do indeed affirm the principle of free enterprise in the banking

---

10. There were seven banks involved on the appeal, and of course nothing said by the agents of two of them could bind the others; but no matter.

11. One must reflect that if predictions of future events were even modestly reliable, the calamitous prophecies of the soothsayers would have brought the world to an end a thousand years ago— and saved us a considerable amount of trouble in this case.

business.[12] All of them recognize, however, that unbridled competition is not compatible with a healthy banking system, and that it ought therefore be curbed by legislation.[13] To that extent, then, public policy which encourages free competition runs counter to the public interest which requires its regulation in these cases, and some adjustment of priorities, some balancing of equities, must consequently be made. The question is: Where shall the line be drawn to avoid undue repression on the one hand and prevent unfair advantage on the other? Obviously and ineluctably, the answer must lie in the sound discretion of the agency charged with responsibility for imposing the curbs at the administrative level; in this case, the Board. A reference to the little summary in footnote 9 will suffice to show that there was competent and substantial evidence to support the Board's decision on all aspects of the issue of "convenience and needs," as that term is explained in footnote 2 for use in this case; "and it matters not that there may have been evidence which would have supported a finding to the contrary." Broad-way National Bank v. Linwood State Bank, 456 S.W.2d 296, 298 (Mo.1970). Here, again, respondent questions the weight of the evidence before the Board and the credibility of those who furnished it; but, as explained in paragraph C(1), above, we are not authorized to entertain that complaint, § 536.140(5), RSMo 1969, V.A.M.S., for to do so would be to substitute our "discretion for discretion legally vested in the agency."

That ends the case. The Board's ruling, from the viewpoint we are required to take of it, was manifestly proper in every respect. The judgment of the circuit court is accordingly reversed and the decision of the Board reinstated and affirmed. The stay order bond of the appealing banks is dissolved and all parties to it are released from liability on it.

TITUS, C. J., HOGAN and BILLINGS, JJ., and DOUGLAS W. GREENE, Special Judge, concur.

STONE, J., not sitting.

12. But there their relevancy ends. Take an example: In Banking Board v. Turner Industrial Bank, 165 Colo. 147, 437 P.2d 531 (1968), the court was dealing with the situation in Durango, Colorado, "the second largest city on the Western Slope" with a county population that had "increased almost 35%" in the past fifteen years, a commercially prosperous, progressive community. We are dealing with Webster County, a rural area, a "bedroom community" for Springfield, which has increased in population only a little more than 3% in the last twenty years according to U. S. Census reports. Durango was served by only two commercial banks, and the dissident bank had applied for membership in that elite class by asking that its charter as an industrial bank be amended to permit it to engage in the commercial banking business, on the basis of an outstanding record of success in the banking field over the past ten years. The Webster County trade territory is served by at least ten banks, and respondent seeks to fragment the business further on the basis of no experience whatever—in the teeth of testimony that the effort, aside from its debilitating effect on the existing banks, would bring about its own insolvency in perhaps two years, evidence which was totally absent from the record in the Durango case. In Gerst v. Houston First Savings Ass'n, 422 S.W. 2d 514 (Tex.Civ.App.1968), the court dealt with a comparably inappropriate situation in Houston, Texas. Analogies between mountains and molehills are not much help to realistic judgment.

13. And with good reason. If a storekeeper, in an excess of competitive zeal, works himself into bankruptcy, the loss is his; but if a bank fails, the domino reaction to its fall brings the whole community down with it, as those of us who survived the debacle of the Great Depression so well remember.