The UNION SAVINGS BANK OF PAT-CHOGUE et al., Appellants,

v.

James J. SAXON, Comptroller of the Currency, et al., Appellees.

No. 18145.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 14, 1964.

Decided June 25, 1964.

See also, D.C., 209 F.Supp. 319.

Mr. John D. Hawke, Jr., Washington, D. C., with whom Mr. Thurman Arnold, Washington, D. C., was on the brief, for appellants.

Mrs. Pauline B. Heller, Attorney, Department of Justice, with whom Asst. Atty. Gen., John W. Douglas, Messrs. David C. Acheson, U. S. Atty., and Morton Hollander, Attorney, Department of Justice, were on the brief, for appellee, Saxon.

Mr. Peter Megargee Brown, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. John S. Walker, Washington, D. C., was on the brief, for appellee, Tinker National Bank of East Setauket.

Before DANAHER, BASTIAN and BURGER, Circuit Judges.

BASTIAN, Circuit Judge:

Appellants are Union Savings Bank of Patchogue, New York, Patchogue Bank, both state-chartered institutions, and Peoples National Bank of Patchogue, a national banking association chartered and existing under the laws of the United States. All appellants have their principal offices in Patchogue, New York. Appellee Saxon is Comptroller of the Currency. Appellee Tinker National Bank, intervenor in the District Court, is a national banking association with its principal office in East Setauket, Long Island, New York.

On March 15, 1962, Tinker National Bank applied to the Comptroller of the Currency to open a branch office at 307 East Main Street in an unincorporated

area immediately contiguous to the incorporated village of Patchogue. Notice of the application was given to the appellant banks by the Superintendent of Banks of New York and by the representative of the Comptroller of the Currency. Each of the three appellant banks filed its protest and stated its grounds for opposition to the application. Investigation of the application for the Tinker branch was duly made and, after intermediate reports,[1] approval for the establishment of the branch was given by the Comptroller. Protests again were made by appellant banks, but ultimately approval of the branch application was given.

After receiving notice of the approval, counsel for appellant banks requested that a hearing be held on the application prior to the actual issuance of the certificate establishing the branch. The hearing was denied by the Comptroller, final permission to open was given, and the branch office was in fact opened July 5, 1962, at a location close to the originally proposed site.

Subsequently, on August 2, 1962, appellants instituted this suit in the District Court, seeking declaratory judgment and injunctive relief from the Comptroller's granting of Tinker's application. On cross-motions for summary judgment, the District Court granted the motions of appellees and denied the motion of appellants. This appeal followed.

Appellants raise essentially two questions: (1) whether appellee Saxon violated § 36(c) of the National Bank Act[2] in granting Tinker's application; and (2) whether appellee Saxon denied appellants due process of law, and violated accepted standards of administrative fairness by basing his approval of Tinker's application in whole or in part on representations made to him at an *ex parte* meeting requested by Tinker. While the second issue raises a sub-

stantial problem in this case, we do not reach that question, in view of our disposition of appellants' first contention.

Appellants argue that the Comptroller violated § 36(c) of the National Bank Act in granting Tinker's application. That statute provides, in pertinent part:

"The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

\* \* \* \* \* \*

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches \* \* (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question *by language specifically granting such authority affirmatively and not merely by implication or recognition,* and subject to the restrictions as to location imposed by the law of the State on State banks. \* \* \*" [Emphasis supplied.]

Thus, under this statute the Comptroller may, in his discretion, permit the establishment of a national bank branch if the statutory law of the particular state would permit a state bank to branch in the same location. On the other hand, in the absence of affirmative state legislation required by § 36(c) no branch may be established, even with the approval of the Comptroller, for "there is no discretion in the Comptroller to approve the establishment of a branch office at a location prohibited by law." Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770, 778 (D.D.C.1959), aff'd, 108 U.S.App.D.C. 37, 278 F.2d 871 (1960). Cf. National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, 541 (6th Cir. 1958).

---

1. The record indicates that the Chief National Bank Examiner in New York had recommended disapproval of the application.

2. Act of Feb. 25, 1927, ch. 191, § 7, 44 STAT. 1228, R.S. 5155, as amended, 12 U.S.C. § 36(c) (1958).

Section 105 of the New York Banking Law, the effect of which is in dispute here, provides:

"1. * * *

"(b) A bank or trust company may open and occupy a branch office or branch offices in any city or village located in the banking district in which is located its principal office * * * provided in no event shall a branch be opened and occupied pursuant to this paragraph (b) in a city or village * * * in which is already located the principal office of another bank, trust company or national banking association. * * *

"4. The term 'village' as used in this section shall mean either an incorporated or an unincorporated village."

The ultimate issue, of course, is whether this statute would authorize the establishment of a state branch bank at the proposed location of the Tinker branch. Specifically, the disagreement between the parties here centers about the meaning of the words "unincorporated village." The statutory language is critical, for nowhere else in the New York statutory provisions is the phrase "unincorporated village" defined.[3]

Appellants argue that the phrase indicates an area possessed of some of the characteristics of a community, "such as a post office, shopping center, business district, school, churches, or even a separate identity recognized in local custom." The unincorporated area in which the Tinker branch is located, appellants contend, is not a "village" in such a sense, and on brief insist, in effect, that the area was here artificially taken to be a "village" in a "transparent attempt to evade and nullify the intent of the New York statute." Thus, it is argued, the establishment of the branch was not authorized

by state legislation, as required by § 36 (c) of the National Bank Act.

In granting Tinker's application, however, the Comptroller interpreted the words to mean any unincorporated area that might theoretically qualify for incorporation as a village under § 2 of the New York Village Law. That statute provides:

"A territory not exceeding three square miles or conforming to the entire boundaries of a water district, lighting, fire or school district, or an entire town, or two entire school districts, containing in each case a population not less than five hundred, and not including a part of a city or village, may be incorporated as a village under this chapter."

Having determined that the area delineated in the application was not more than three square miles in area and was populated by more than five hundred persons, which facts appellants do not dispute, the Comptroller decided that Tinker properly qualified as a branch applicant, and "in the exercise of his discretion" issued the certificate granting the application. Appellants argue that the Comptroller's interpretation in effect writes the word "village" out of § 105 of the Banking Law. We find ourselves in agreement with appellants.

■ Traditionally, the word "village" has connoted an area possessed of some attributes of a community. As observed by the Michigan Supreme Court in Wyandotte Savings Bank v. State Bank Comm'r, 347 Mich. 33, 41, 78 N.W.2d 612, 617 (1956):

"The word 'village' is not a technical word, or one having a peculiar meaning, but is a common word in general usage with an ancient lineage. It is merely an assemblage or community of people, a nucleus or cluster for residential and business purposes, a collective body of inhabi-

3. In fact, § 54 of the New York General Construction Laws, which contains rules of statutory construction prescribed by the Legislature, defines the word "village" to mean "incorporated village." Thus no political entity is recognized as an "unincorporated village" under the New York statutes.

tants, gathered together in one group." [4]

Inasmuch as the New York Banking Law does not specifically define the word "village," it must be presumed that the New York Legislature intended it to be given its natural meaning.[5]

We are of the opinion that the Comptroller, in choosing to define "unincorporated village" as any unincorporated area possessed merely of the minimum geographic and population requirements for incorporation under § 2 of the Village Law, has ignored entirely the usual and customary meaning of the word "village." [6]  In the absurd extreme, a boundary could be drawn around a sufficiently large apartment house and meet the not-more - than - three - square - miles - nor-less - than - 500 - people prerequisite for incorporation. Moreover, adoption of the Comptroller's interpretation would permit, if not promote, the gerrymandering of boundaries for purposes of branch bank applications.  For example, an applicant for a national bank branch could arbitrarily delineate boundaries within a larger unincorporated area which included the requisite three square miles or less and having more than a 500 population.  Following a grant of that application, the boundaries delineated would have no further significance.  Consequently, a subsequent applicant for a branch could likewise draw another arbitrary boundary in the same general area, perhaps greatly overlapping what had been the area used by the earlier applicant, and so on.

In State Bank of Kenmore v. Bell, 197 Misc. 97, 96 N.Y.S.2d 851, aff'd, 277 App. Div. 924, 98 N.Y.S.2d 493 (1950), cited by both parties here, the petitioner, a state bank, challenged the approval of a branch application by the New York Banking Board.  It was argued, among other things, that the Board had violated § 105 of the Banking Law in granting an application for the opening of a branch bank outside a city or village; "that it was not the intention of the Legislature to include within the provisions of the section any area which had not been incorporated as one of the statutory municipalities therein named."  96 N.Y.S.2d at 855.  The court brushed aside the argu-

4. Compare Community National Bank of Pontiac v. Saxon, 310 F.2d 224 (6th Cir. 1962); Lukens Steel Co. v. Perkins, 70 App.D.C. 354, 357-60; 107 F.2d 627, 630-33 (1939), rev'd on other grounds, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); Application of Howard Savings Institute of Newark, 32 N.J. 29, 159 A.2d 113 (1960); Upper Darby National Bank v. Myers, 386 Pa. 12, 124 A.2d 116 (1956).

5. 1 McKinney's Consolidated Laws of New York states:
"§ 94. * * * The language is generally construed according to its natural and most obvious sense, without resorting to an artificial or forced construction. Words of ordinary import receive their understood meaning, and technical terms are construed in their special sense. * * *
"232. * * * words of ordinary import are to be construed according to their ordinary and popular significance. * * * *"
And cf. cases there cited.

6. Evidence of record shows:
" * * * The site of the Tinker branch is not in a shopping center or business district in any way distinct from the downtown business district of the Incorporated Village of Patchogue.
"The area of location has none of the characteristics of a village.  It has no local government, post office, fire district, police district or schools of its own and it has no water, sewage, electrical or other utility service serving it alone.  It has no political or geographic features to identify it or distinguish it from the larger unincorporated area of which it is a part.  Neither is the area of location known, as a matter of local practice or custom, as a discrete, distinct, identifiable place.  It is, in fact, considered as a part of the 'Village' of Patchogue."
Tinker's president, Hall, testified on deposition, in part, as follows:
"Q.  Is there any reason why you located four hundred feet east of the incorporated village of Patchogue rather than [in] the village itself?
"A.  We would have been prohibited by law from going into the village. * * *  I told you we made a survey and it looked like a very good spot for us."

ment, noting that "village" was defined in the statute as either an incorporated or an unincorporated village, and that the petitioner's construction "would defy the plain words of the statute." Ibid.

Thus, the question decided in that case was simply whether the statute authorized the opening of a branch bank outside the limits of an incorporated municipality. The court had no need to, and did not, construe the words "unincorporated village." [7] Nor did the court determine whether there was any differentiation between "unincorporated *area*" and "unincorporated *village*," as appellants here suggest. However, the court did observe:

"To adopt the petitioner's view would be to deny banking facilities to residents of the state who live in populated but unincorporated areas *wherein every other facility for modern living exists* on the basis that the areas involved although eligible to do so had not been formally incorporated. The Legislature did not intend such and has expressly said so. * * *" Ibid. [Emphasis supplied.]

We feel that if the court's opinion indicates anything on the point, it suggests that an "unincorporated village" would be an area possessed of some attributes of community life or interests. The opinion does not support appellees' interpretation.

In appellees' brief, it is contended that the Comptroller's interpretation "accords with the provisions of the

New York statute, *as interpreted by the New York banking authorities*" and that "the Comptroller observed the provisions of the New York statute *as applied administratively* and judicially." [Emphasis supplied.] The references made are to the New York Banking Department's use of the incorporation prerequisites in the Village Law, § 2 as guidelines in its administration of § 105 of the Banking Law.[8] Section 36(c) of the National Bank Act, however, is clear and specific that a national bank may branch only where a state bank branch would be authorized "by the *statute law* of the State in question *by language specifically granting such authority affirmatively and not merely by implication or recognition* * * *." [Emphasis supplied.] Since we are of the opinion that the § 36(c) reference to "the statute law of the State" includes legislative enactments and not administrative interpretations of those enactments, the New York Banking Department's view of § 105 of the New York Banking Law would not be authority for the establishment of the Tinker branch. Cf. State v. National Bank of South Dakota, 219 F.Supp. 842, 848–51 (D.S.D.1963).

In view of the foregoing, the judgment of the District Court granting the motions by appellees for summary judgment is vacated. The case will be remanded to the District Court for further proceedings not inconsistent with this opinion.[9]

So ordered.

7. Indeed, the Banking Department's brief in Kenmore, cited to us in the record of this case, suggests that the area in question there did, in fact, include schools and churches.

8. In the deposition of Mr. Boris S. Berkovitch, Deputy Superintendent and Counsel of the New York State Banking Department, offered in support of intervenor Tinker's motion for summary judgment, the following appears:
"Q. Is it fair to characterize the Department's interpretation of the words 'unincorporated village' in Section 105 of the Banking Law as an administrative interpretation of the statutory language?

"A. Well, it is the interpretation of the New York State Banking Department.
"Q. There is no other interpretation of those words 'unincorporated village' that you have followed in passing on branch applications then, to your knowledge?
"A. I don't know of any other interpretation."

9. Appellants have sought leave to file a supplemental memorandum. Since it purports to bear upon the second issue, which we do not reach, we deem it unnecessary to rule upon the motion.