BANK OF CRESTWOOD, a Missouri Banking Corporation, Appellant,

v.

GRAVOIS BANK, a Missouri Banking Corporation, et al., Respondents.

No. 62179.

Supreme Court of Missouri, En Banc.

May 11, 1981.

Rehearing Denied June 8, 1981.

---

Robert F. Schalfly, St. Louis, for appellant.

J. Anthony Dill, Gerre S. Langton, Evans & Dixon, St. Louis, for respondents.

WELLIVER, Judge.

The Bank of Crestwood (Crestwood) appeals from a judgment of the circuit court affirming an order of the State Banking Board (Banking Board) which approved the granting of a certificate of authority by the Commissioner (now Director) of Finance to Gravois Bank for the operation of a banking facility in St. Louis County. This cause was originally taken to the Court of Appeals, Eastern District, which reversed the circuit court. The cause was transferred to this Court for examination of the question raised which is one we deemed to be of general interest and a matter of first impression as to the statutes involved. Rule 83.03. The case is determined here as though on original appeal. Mo.Const. Art. V, § 10; Rule 83.09. We affirm the judgment of the Circuit Court.

The facts are simple and for the most part undisputed. Gravois Bank and the site for the proposed facility are both located in an unincorporated section of South St. Louis County. The Gravois Bank's main banking house is located at Heege and Gravois Roads in an area generally known as Affton. The proposed facility site is approximately four and one-half miles west of Gravois Bank's main banking house at 11659–85 Gravois Road in an area generally known as Sappington. Crestwood is located approximately one and one-half miles north of the proposed facility site. The standing of Crestwood in this action was established in *Bank of Crestwood v. State Banking Board*, 554 S.W.2d 519 (Mo.App. 1977), where it was ordered that the Banking Board conduct a hearing. Following the hearing, the Banking Board issued findings of fact, conclusions of law and its order confirming the Commissioner's issuance of a certificate of authority for Gravois Bank to operate a facility at the proposed site.

The Banking Board made the following findings of fact and conclusions of law:

4. Based on the record before the Board taken as a whole, the Board finds:

(a) Gravois Road is an historic artery of travel in South St. Louis County, Missouri, running southwest from the City of St. Louis through the City of Fenton, Missouri.

(b) In the late 1800's and the early 1900's, major family landholdings along Gravois Road were dissolved and the entire length of Gravois Road in St. Louis County was bordered almost exclusively by small farms and truck gardens. This agricultural community was populated primarily by persons of German ancestry who had many occupational and social connections.

(c) In the late 1800's the area located around the intersection of Gravois and Tesson Ferry Roads became known as Aff's town (later Affton) after a merchant who maintained a post office at that intersection. A short distance to the west on Gravois Road, the name Sappington was given to the area around the intersection of Gravois and Sappington Roads. The distance between Gravois Bank in the area known as Affton and the proposed facility site in the area known as Sappington is approximately 4.6 straight-line miles.

(d) Gravois Bank was chartered in 1913. Of its none initial directors, four came from the Sappington area. From and after the time of incorporation, Gravois Bank was the only bank located on Gravois Road between Grand Avenue in the City of St. Louis and the City of Fenton, located south of the Meramec River. From the time of its organization, many of the farming families and merchants in the area along Gravois Road in St. Louis County patronized the bank. The evidence presented to the Board shows that substantial numbers of persons in the unincorporated areas of Affton and Sappington along Gravois Road maintain deposit and loan accounts at the Gravois Bank. These accounts are substantially greater in dollar amount than accounts maintained with Gravois Bank by residents of the Lemay area which is geographically much closer to Gravois Bank and its existing facility. The banking habits of the residents of the Affton and Sappington areas suggest the exist-

ence of a community for banking purposes.

(e) Statistical data presented to the Board indicates that housing values and income levels throughout the entire area along Gravois Road in St. Louis County fall in the middle to upper middle categories. More than two-thirds of the entire working population of the area is engaged in white collar occupations and most workers of all classifications leave the area daily for commercial and industrial centers of St. Louis and St. Louis County for their employment. Most of the residential housing stock in this area is less than thirty years of age.

(f) Residents in the Affton and Sappington areas are in close proximity geographically and obtain most municipal type services from the same source, the charter government of St. Louis County. Emergency services are obtained through the same sources and all police services are rendered through the third precinct of the St. Louis County Police Department. An Affton school district and an Affton fire protection district exist as political subdivisions in the area. No political subdivision bearing the name Sappington exists. An examination of the boundaries of school districts and fire protection districts as well as non-legal boundaries such as postal zip codes, Catholic parish boundaries and census designated places shows that few boundaries coincide. This evidence leads the Board to conclude that each of such boundaries was drawn for reasons related to the purpose or objective of the political or social entity encompassed therein.

(g) In addition to the evidence relating to the common banking habits of the people in the places designated as Affton and Sappington, other credible evidence was presented to the Board by disinterested parties including a veteran locally elected official, a long-time community newspaper editor and a St. Louis County Planning Department professional staff member, each of which verified that common backgrounds, traits and concerns exist among the families populating the unincorporated areas of South St. Louis County and further that no valid basis existed for distinguishing between residents in the Affton and Sappington areas along Gravois Road in South St. Louis County.

(h) The Bank of Crestwood was incorporated in 1958. For over forty years prior to the incorporation of that bank, the Gravois Bank had served the Gravois Road community of people including both the Affton and Sappington areas. The relative proximity of the two locations and the substantial number of accounts representing people who have relied upon the Gravois Bank for banking services in the Sappington area lead the Board to believe that an unnecessarily restrictive interpretation of the term 'community' would render a disservice to the people who have been served by the Gravois Bank. Since the only issue before the Banking Board, by stipulation, is the interpretation of the term 'community,' it is clear that an interpretation which allows the Gravois Bank to continue to serve its customers in the Sappington area will contribute to the convenience and needs of the community which Gravois Bank has served and will continue to serve.

### CONCLUSIONS OF LAW

1. The judicial precedents to which the Board has been referred by counsel indicate that the legal concept of 'community' is a broad and flexible one and one which changes shape depending upon the purposes for which the term is applied.

2. The law under which the Commissioner of Finance approved the facility for Gravois Bank, Section 362.107, was designed to increase the convenience of banking services to the general public. It is the duty of the Banking Board to implement this statutory policy in its decisions.

3. The residents and businesses along Gravois Road surrounding the main banking house of the Gravois Bank and the proposed facility site of the Gravois Bank

share a sufficient community of interests to constitute that area a single unincorporated community within the meaning of Section 362.107. The application of the Gravois Bank satisfies the statutory criteria set forth in Section 362.107, RSMo. Supp. 1975, and therefore, Certificate of Authority No. 310–A issued by the Commissioner of Finance for the operation of said banking facility was in all respects proper.

Following review by the Circuit Court of St. Louis County, the following judgment was entered:

## JUDGMENT

This cause, having previously been taken under advisement on the 15th day of November, 1978, is again taken up for consideration on this 18th day of December, 1978; and the Court finds that the order and decision of the State Banking Board dated November 21, 1977, is not in excess of any statutory authority or jurisdiction of the State Banking Board; is supported by substantial and competent evidence upon the whole record; is not any reason unauthorized by law; is not arbitrary or capricisious; [sic] does not involve an abuse of discretion; and is lawful, reasonable, and proper in all respects.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the order and decision of the State Banking Board of November 21, 1977, be and the same is hereby affirmed. The costs of this action are taxed against plaintiff.

1. All final decisions, findings, rules and orders on any administrative officer or body existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights, shall be subject to direct review by the courts as provided by law; and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record. . . .
Mo.Const. Art. V, § 18.

2. 2. The inquiry may extend to a determination of whether the action of the agency

Our standards of review are clearly enunciated in Mo.Const. Art. V, § 18,[1] Rule 100.07(b), and § 536.140.2, RSMo 1978,[2] and has been recognized and stated with equal clarity by our courts:

A reviewing court is not authorized to weigh the evidence on which the decision of an administrative agency is based and make its own appraisal of the merits of the case by its own standards, and so to 'substitute its discretion for discretion legally vested in the agency,' uninhibited by the contrary mandate of § 536.140(5), RSMo 1969, V.A.M.S. It may not, in bankers' language, put a premium on the losing party's evidence to the end that a different result may be borrowed on the strength of its enhanced value. The losing party's evidence must be received by the court at the discount placed on it by the administrative tribunal that decided against it, unless that discount is so palpably arbitrary that reasonable minds cannot doubt the injustice of it. And in passing on that point 'the court is required to view the evidence in the light most favorable to the decision of the tribunal, giving to the decision the benefit of all reasonable inferences to be derived from the evidence produced. ... And, of course, the determination of the credibility of witnesses is a function of the administrative body.'

*Marshfield Community Bank v. State Banking Board*, 496 S.W.2d 17, 26–27 (Mo.App. 1973), *quoting, Edwards v. Firemen's Retirement System of St. Louis*, 410 S.W.2d 560, 567–68 (Mo.App. 1966), and:

(1) Is in violation of constitutional provisions;
(2) Is in excess of the statutory authority or jurisdiction of the agency;
(3) Is unsupported by competent and substantial evidence upon the whole record;
(4) Is, for any other reason, unauthorized by law;
(5) Is made upon unlawful procedure or without a fair trial;
(6) Is arbitrary, capricious or unreasonable;
(7) Involves an abuse of discretion. . . .
§ 536.140.2, RSMo 1978. Rule 100.07(b) is substantially the same as this section of § 536.140.

We are required to view the record in the light most favorable to the findings of the Board ... and determine only whether the administrative action was unlawful, arbitrary, and an abuse of discretion, or not supported by competent and substantial evidence upon the whole record.

*Blue Ridge Bank v. State Banking Board,* 509 S.W.2d 763, 769 (Mo.App. 1974).

In addition, the State Banking Board is a uniquely qualified administrative body. Section 361.097, RSMo 1978, provides:

361.097. Banking board—members—appointment—qualifications—terms.—The state banking board shall consist of five members who shall be appointed by the governor, the senate concurring. No person shall be eligible for appointment unless he shall be a resident of this state. One member shall be an attorney at law and a member of the Missouri Bar in good standing. Two members shall each have had at least ten years' experience in this state as an officer or director or partly as an officer and partly as a director of one or more state banks or trust companies or national banking associations, of which at least five years shall have been full-time, active bank management experience. The two other members shall be non-bankers. Not more than three members of the board shall be members of the same political party. . . .

Section 361.093, RSMo 1978, provides,

361.093. Banking board to advise and recommend.—The state banking board shall advise with the director of finance as to the proper administration of his office and the banking laws of this state and *make recommendations to the general assembly as to changes in these laws.* (Emphasis added.)

The requirement and findings of the Banking Board for locating facilities are not dissimilar from the requirements and findings for granting bank charters. With reference to the granting of charters, our appellate court has stated:

Facts to be determined include the convenience and needs of the community to be served, the probable volume of business of the new bank, its potential for solvency, and the effects of the new bank upon the solvency of other banks in the locality. Obviously, 'facts' of this nature are not capable of exact proof, they must fall into the area of educated prediction. They are inevitably to be determined by *a factfinder vested with a certain expertise* relying upon opinions of experts in the field which opinions in turn are based upon a knowledge of the area, the business involved, the nature of the people to be served, the general economic climate and other factors relied upon by businessmen generally but incapable of precise proof.

*Lemay Bank and Trust Company v. Oakville Bank and Trust Company,* 518 S.W.2d 128, 130 (Mo.App. 1974) (emphasis added).

The underlying question to be decided on this appeal is whether the Banking Board and the circuit court properly construed the type or kind of "unincorporated community" the legislature intended when they said that no bank can maintain or operate a drive-in bank facility outside the "city, town or village or *unincorporated community"* in which the bank is located, § 362.107.-2(2), RSMo Supp. 1975 (emphasis added), and when they further said that in determining whether or not to authorize the facility, the director and the Banking Board shall take into consideration the convenience, needs and welfare of the people in the "community and area served." § 362.-107.3(1), RSMo Supp. 1975. We must construe the legislature's purpose and intent in the use of these words.

Crestwood urges, and the court of appeals apparently tended to agree, that the legislature intended by the use of the words "unincorporated community" to limit the location of the facility to a definable geographic area. The Banking Board, on the other hand, interpreted the words as used in connection with other sections of the act to mean that the two locations, main banking house and the proposed facility, must share a sufficient (banking) community of interest to constitute a single unincorporated community within the meaning of § 362.-107.

The only real issue here involved is whether or not the Banking Board reasonably and correctly interpreted and applied the applicable law.

Legislative intent or the meaning of the words used by the legislature is neither found in nor determined from the facts of the case under consideration by the Court. Legislative intent must be found independent of the facts, and having been so found, it must then be applied to the facts of the given case under consideration.

Legislative intent and the meaning of words used in the statute can in many instances be found from the general purposes of the legislative enactment itself. The cardinal rule in statutory construction is to ascertain the intent of the lawmakers and to give effect to that legislative purpose. *State v. Kraus*, 530 S.W.2d 684, 685 (Mo. banc 1975); *Flarsheim v. Twenty Five Thirty Two Broadway Corporation*, 432 S.W.2d 245, 251 (Mo. 1968); *Edwards v. St. Louis County*, 429 S.W.2d 718, 722 (Mo. banc 1968); *State ex rel. Schwab v. Riley*, 417 S.W.2d 1, 4 (Mo. banc 1967); *State ex rel. Wright v. Carter*, 319 S.W.2d 596, 599 (Mo. banc 1958). *See Central Bank of Clayton v. State Banking Board*, 509 S.W.2d 175, 182 (Mo.App. 1974).

To aid in ascertaining the legislative purpose, the Court should, whenever possible, attribute to the words used their plain meaning. *Kieffer v. Kieffer*, 590 S.W.2d 915, 918 (Mo. banc 1979); *Beiser v. Parkway School District*, 589 S.W.2d 277, 280 (Mo. banc 1979); *State ex rel. Conservation Commission v. LePage*, 566 S.W.2d 208, 212 (Mo. banc 1978); *State ex rel. Zoological Park Subdistrict of the City and County of St. Louis v. Jordan*, 521 S.W.2d 369, 372 (Mo. 1975); or, the meaning of the words as customarily used by the legislature in other legislative enactments. *Derboven v. Stockton*, 490 S.W.2d 301, 310 (Mo.App. 1972).

Another aid in ascertaining legislative intent is when the same or similar words are used in different places within the same legislative act and relate to the same or similar subject matter, then the statutes are in *pari materia* and should be construed to achieve a harmonious interpretation of the statutes. *City of Raytown v. Danforth*, 560 S.W.2d 846, 848 (Mo. banc 1977); *State v. Kraus*, 530 S.W.2d 684, 686–87 (Mo. banc 1975); *ITT Canteen Corporation v. Spradling*, 526 S.W.2d 11, 16 (Mo. 1975); *Flarsheim v. Twenty Five Thirty Two Broadway Corporation*, 432 S.W.2d 245, 251 (Mo. 1968); *State ex rel. Smithco Transport Company v. Public Service Commission*, 316 S.W.2d 6, 12–13 (Mo. banc 1958); *Southwest Forest Industries, Inc. v. Loehr Employment Service of Kansas City, Inc.*, 543 S.W.2d 322, 324 (Mo.App. 1976); *State ex rel. Salter v. Barry*, 486 S.W.2d 47, 50 (Mo. App. 1972); *Duckworth v. United States Fidelity & Guaranty Company*, 452 S.W.2d 280, 286 (Mo.App. 1970). *See Farmer's Bank of Antonia v. Kostman*, 577 S.W.2d 915, 923 (Mo.App. 1979).

We examine first, the words used and the manner in which they were used in the Missouri Banking Code, Chapter 362. Section 362.107.2(2), RSMo Supp. 1975, provides in part:

2. No such bank or trust company may maintain or operate:

(2) . . . a facility outside the limits of the city, town or village or *unincorporated community* in which its banking house is located . . . .

(Emphasis added.)

Section 362.107.3 RSMo Supp. 1975, provides in part:

3. . . . In determining whether or not to approve the application for the facility, the director shall take into consideration the following facts:

(1) The convenience, needs and welfare of the people of the *community and area served*; . . .

(Emphasis added.)

We also note other references of similar import within the Banking Act. Section 361.094, RSMo 1978, requires the Banking Board to hear appeals from refusals of the director (commissioner) to: "1. . . . issue certificates . . . to provide for the relocation of these banks in *other communities*, . . ." (Emphasis added.)

Section 362.010(7), RSMo 1978, states: "'Population' means population as determined by the last state or federal enumeration; or when used in connection with the words *'unincorporated village'* as determined by the finance commissioner from the best available sources of information." (Emphasis added.)

Section 362.325.7, RSMo 1978, provides that before there can be a bank relocation that "the convenience and needs of the *new community* wherein the bank desires to relocate are such as to justify and warrant the opening of the bank therein...." (Emphasis added.)

Section 362.030.1, RSMo 1978, relating to the chartering of banks, requires the director, before granting the charter, to determine: "1. ... if *the convenience and needs of the community to be served* justify and warrant the opening of the bank or trust company therein, ... " (Emphasis added.)

Section 362.040, RSMo 1978, relating to notice of refusal to certificate a new bank contains the "convenience and needs of the community to be served" test in almost identical language as that used in § 362.030.1, RSMo 1978.

Section 362.108, RSMo Cum.Supp. 1980, provides in part:

1. ... any bank with its main banking house in a county of the second, third or fourth class may, with the approval of the director of finance, establish, maintain, and operate one separate facility in that county in an *incorporated or unincorporated town* with a population of not more than one thousand five hundred and fifty which does not have banking services, provided that such facility is located not more than fifteen miles from the main office of the bank....

(Emphasis added.)

"Community" is a word that frequently occurs in these sections of the Banking Code. Lexis tells us, that as of its most recent update, the word community appears 193 times in over thirty-one chapters of the Missouri statutes, including those sections of the Banking Code cited above containing the word community.[3] A cursory examination of these statutes convinces us that it is but an exercise in futility to attempt to draw from these 193 sections either a description of or a standard for identification of an ordinary or customary meaning for the word "community." The statutory references are to a myriad of community types, most being identified with the purposes of the act in which they appear. *See* § 205.975 et seq., RSMo 1978 and Cum.Supp. 1980 ("Community" Mental Health Centers); ch. 251, RSMo 1978 and Cum.Supp. 1980 (Department of "Community" Affairs).

An examination of the Missouri statutes using the words "unincorporated city or unincorporated town or unincorporated village" revealed twelve separate sections including the above cited sections of the Banking Code containing those words.[4]

---

**3.** The statutes in question deal with such diverse subjects as urban redevelopment, ch. 99; planned industrial expansion, ch. 100; public employee labor organizations, ch. 105; the merchant's and manufacturer's tax, ch. 150; education, ch. 162; student loan programs, ch. 173; vocational education, ch. 178 sheltered workshops, ch. 178; libraries, ch. 181; war memorials, ch. 184; the Missouri Commission on the Status of Women, ch. 186; public water and sewer districts, ch. 192; community mental health centers, ch. 205; the Missouri Housing Development Commission, ch. 215; the Department of Community Affairs, ch. 251; the Division of Commerce and Industrial Development, ch. 255; the Interagency Council for Outdoor Recreation, ch. 258; the Environmental Improvement Authority, ch. 260; unemployment benefits, ch. 288; employment discrimination, ch. 290, 296; airports, ch. 305; the licensing of veterinarians, ch. 340; business corporations, ch. 351; religious and charitable corporations, ch. 352, 355; railroad stations, ch. 389; landlord-tenant law, ch. 441; the award of child custody in marriage dissolution proceedings, ch. 452; bail, ch. 544; and parole, ch. 549. All statutory references are to the Revised Statutes of Missouri, 1978.

**4.** *See* § 71.090, RSMo 1978; § 72.080, RSMo 1978; § 72.090, RSMo 1978; § 80.020, RSMo 1978; § 231.340, RSMo 1978; § 231.360, RSMo 1978; § 231.400, RSMo 1978; § 249.440, RSMo 1978; § 362.010(7), RSMo 1978; § 362.050, RSMo 1978; § 362.108.1, RSMo Cum.Supp. 1980; § 362.115, RSMo 1978.

Upon examination of this group of statutes using the words unincorporated city, town, or village, we do find emerging from them a general concept or meaning and certain general characteristics. These characteristics are probably best summarized and described in § 72.080, RSMo1978, which makes provision for municipal incorporation of unincorporated areas. The statute contemplates a "city" or "town," a known population, necessary assessed valuation of property, and the potential ability to function as a municipality and to furnish normal municipal services. *In Petition to Incorporate the City of Duquesne*, 322 S.W.2d 857 (Mo. 1959), this Court defined the words "city" or "town" as used in this statute to mean a "compact center of population, and might include, to the extent proper, a suburban area having *a unity of interest therewith*." 322 S.W.2d at 863 (emphasis added).

The banking statutes that may use this concept include the following statutes. Section 362.108, RSMo Cum.Supp. 1980, which allows a bank to operate a separate banking facility in the smaller second, third or fourth class counties in an "incorporated or unincorporated town with a population of not more than one thousand five hundred and fifty...." Section 362.115.1, RSMo 1978, allows a bank to have the fiduciary powers of a trust company if the bank has "paid-up capital of at least fifty thousand dollars in any *unincorporated or incorporated village or city* having a population of less than ten thousand inhabitants ...." Section 362.050.1, RSMo 1978, creates capital requirements of:

(1) Fifty thousand dollars if the place where its business is to be transacted is an *unincorporated or incorporated village or town* the population of which does not exceed five thousand inhabitants;

(2) Seventy-five thousand dollars if the place where its business is to be transacted is an *unincorporated or incorporated town* the population of which exceeds five thousand but does not exceed ten thousand inhabitants....

(Emphasis added.)

The words "unincorporated area" are used with some frequency in the statutes to mean "all unincorporated areas of the county." § 66.620.2, RSMo Cum.Supp.1980 (County Sales Tax). *See* § 66.300, RSMo 1978 (County Utilities License Tax); § 66.-320.2, RSMo 1978 (County Motor Vehicle License Tax); § 66.350.2, RSMo 1978 (County Cigarette Tax).

An unincorporated "community" would reasonably seem to be something in between an "unincorporated area" (the remaining unincorporated area of the county) and an unincorporated "city" or "town" which has all of the potential for becoming an incorporated city or town.

The Bank Code uses the words "unincorporated community," "community and area served," "incorporated or unincorporated town," "unincorporated village," "the community," "town and community," "community to be served," "other communities." In conjunction with these words, the same statutes use words such as, "in such locality" and "in the locality."

■ In the Bank Code, the legislature clearly enunciated and spelled out for the director and the Banking Board a test for incorporation of a new bank, § 362.030, for authorizing the relocation of a bank, § 362.-325.7, for authorizing the location of a drive-in bank facility, § 362.107.3(1), and for the operation of a facility in the smaller second, third and fourth class counties, § 362.108.2. As stated in *Farmer's Bank of Antonia v. Kostman*, 577 S.W.2d 915, 923 (Mo.App.1979), "[i]t is the persistent and cogent theme of these banking laws that a new bank entry, whether by charter, relocation or facility shall serve the convenience and needs of the community...." The "convenience and needs of the community" is a business test which involves balancing the public interest in satiating the economic demand for banking services through the promotion of competition against the equally important public interest in avoiding unsafe banking practices. *Farmer's Bank of Antonia v. Kostman*, 577 S.W.2d 915, 923 (Mo.App.1979); *Bank of Belton v. State Banking Board*, 554 S.W.2d 451, 456 (Mo. App.1977); *Glasnapp v. State Banking*

*Board*, 545 S.W.2d 382, 387–88 (Mo.App. 1976); *Central Bank of Clayton v. State Banking Board*, 509 S.W.2d 175, 181–85 (Mo.App.1974); *Blue Ridge Bank v. State Banking Board*, 509 S.W.2d 763, 767–68 (Mo.App.1974); *Suburban Bank of Kansas City v. Jackson County State Bank*, 330 S.W.2d 183, 187 (Mo.App.1959). This test insures the existence of a balanced banking market structure; the test avoids the excess of monopoly on the one hand and the instability of cut-throat competition on the other.

The legislature in the clearest of terms has enunciated its purpose in authorizing drive-in bank facilities. Banks historically were located in the very heart of the commercial downtown area where during this century parking has become both a major and expensive problem for the public.

The 70th General Assembly, H.B. 568, § 1, Laws of Mo. 1959, p. 1, in first authorizing drive-in bank facilities stated that the purpose was to permit banking institutions to "provide convenient banking service for the large proportion of the people who must come to their banks by automobile." *See Bank of Belton*, 554 S.W.2d 451, 455 (Mo. App.1977). That same purpose has continued throughout the development and expansion of the banking facility laws.[5]

■ The purpose of making banking convenient for the public and the mandated test of "convenience and needs of the community" make it abundantly clear that when the legislature used the words "unincorporated community", "community and area to be served", and "community to be served", they had in mind "a banking community" as opposed to a fixed geographic area. This is entirely consistent with the

5. The original banking facility bill, H.B. 568, Laws of Mo. 1959, p. 1; § 362.107, RSMo 1959, allowed the drive-in facilities only the powers to pay checks, receive and withdraw deposits, and make change. It generally allowed a bank only one drive-in bank facility. It did not allow a drive-in facility to be located more than 1000 yards from the bank or trust company's main banking house. It did not allow the drive-in facility "outside the limits of the city, town, or village or unincorporated community in which its banking house is located." *Id.* It generally did not allow the drive-in facility to be closer than 400 feet from any other main banking house. It also required the approval of the Commissioner of Finance (director) before a facility could be put into operation.

S.B. 146, Laws of Mo. 1971–72, p. 349; § 362.107, RSMo Supp. 1971, increased the powers of a drive-in facility to allow them to make exchange, issue bank money orders, and receive loan payments. It also increased the distance that a banking facility could be located from the main banking house from 1000 yards to 4000 yards.

H.B. 1062, Laws of Mo. 1971–72, p. 973; § 362.107, RSMo Supp. 1973, increased the number of banking facilities a bank could have from one to two. It prohibited the operation of a drive-in bank facility outside the county in which the main banking office is located and completely eliminated the requirement that the drive-in facility could be no more than 4000 yards from the bank.

H.B. 838, Laws of Mo. 1971–72, p. 975; § 362.108, RSMo Supp. 1973, allowed a bank with its main banking house located in a third class county with a population not exceeding 35,000 to operate a separate facility in that

county in a town that had a population not exceeding 1,550 which did not have banking services and which was not more than ten miles from the bank.

H.B. 1198, Laws of Mo. 1975–76, p. 731; § 362.108, RSMo Supp. 1976, changed § 362.-108 to allow the operation of a separate facility if the bank is in a second, third, or fourth class county and the facility was located in an "incorporated or unincorporated town" in that county with a population of 1,550 or less which did not have banking services and which was not more than 15 miles from the main banking house. It also allowed facilities operating under § 362.107 or § 362.108 to make loans.

S.B. 794, Laws of Mo. 1978, p. 623; § 362.107, RSMo 1978, formally lists the making of loans as an express power of a drive-in banking facility operating under § 362.107.

H.B. 1071, Laws of Mo. 1980, p. 405; § 362.-107, RSMo Cum.Supp. 1980, expands the right of review over the director's actions concerning the operation of a bank facility under § 362.107 by allowing a competitor of a bank the right to contest the granting of an application to operate a drive-in banking facility, in effect codifying *Belton v. State Banking Board*, 554 S.W.2d 451 (Mo.App.1977) and *Bank of Crestwood v. State Banking Board*, 554 S.W.2d 519 (Mo.App. 1977). H.B. 1071; § 362.108.2–.3, RSMo Cum. Supp. 1980, provides criteria and a right of review over the director's decision concerning the operation of a bank facility under § 362.-108, in effect codifying *Farmer's Bank of Antonia v. Kostman*, 577 S.W.2d 915 (Mo.App. 1979).

limitation of not locating a facility "outside the limits of the city, town *or* village *or* unincorporated community" in which the main bank is located. § 362.107.2(2), RSMo Supp. 1975 (emphasis added). It is equally consistent with the power granted in § 362.-108, RSMo Cum.Supp. 1980, that in the smaller, second, third, and fourth class counties a bank may locate a separate facility as much as 15 miles from the bank in either an incorporated or unincorporated town without banking facilities and not having a population of more than 1,550.

The Banking Board's conclusions of law are entirely compatible with the intent of the legislature as reflected in the statutes and viewed in terms of recognized rules of statutory construction. We find no abuse of the State Banking Board's power or discretion in applying the law to the facts before the Board. There is substantial and competent evidence to support the finding that a single unincorporated community exists under these facts. *Washington Commercial Bank v. Bollwerk*, 582 S.W.2d 695, 697 (Mo.App.1979); *Central Bank of Clayton v. State Banking Board*, 509 S.W.2d 175, 188–90 (Mo.App.1974); *Marshfield Community Bank v. State Banking Board*, 496 S.W.2d 17, 26–27 (Mo.App.1973).

We affirm the judgment of the Circuit Court of St. Louis County, which affirmed the order of the State Banking Board which approved the granting of a certificate of authority (No. 310–A) by the Director of the Department of Finance to Gravois Bank for the operation of a banking facility at 11659–85 Gravois Road.

DONNELLY, SEILER, and HIGGINS, JJ., concur.

RENDLEN, J., dissents in separate dissenting opinion filed.

BARDGETT, C. J., and MORGAN, J., dissent and concur in separate dissenting opinion of RENDLEN, J.

RENDLEN, Judge, dissenting.

I respectfully dissent. The issue presented is whether Gravois Bank (Gravois) and its proposed facility are located in the same "unincorporated community" as required by Sec. 362.107.[1] Gravois Bank and the facility site for which it seeks approval are in an unincorporated section of south St. Louis County. The bank, located at Heege and Gravois roads, is in an area known as Affton, while the facility site lies approximately four and one-half miles to the west at 11659–85 Gravois Road in an area generally referred to as Sappington. Crestwood Bank (Crestwood), which challenges this application, is located about one and one-half miles from the proposed facility.

We are confronted with a question of law as to the meaning of the statutory phrase "unincorporated community" found in Section 362.107 which prohibits branch banking, except it allows facilities as adjuncts of the main banking house. That Section provides that no bank may maintain "[m]ore than two such facilities...," § 362.107.2(1), which may not be established "outside the limits of the [1] *city*, [2] *town*, [3] *village* or [4] *unincorporated community* in which its banking house is located." (Emphasis added) Subsection 362.107.2(2).[2] That subsection 2(2) contains a further geographical limitation preventing location of a facility "outside the county in which the bank . . . is located, even if the limits of such [1] *city*, [2] *town*, [3] *village* or [4] *unincorporated community* extend across county lines...". (Emphasis added) Section 362.107.2(3) provides an additional geographic limitation restricting the establishment of a facility in that it may not be located (other than

---

1. All statutory references are to RSMo 1978. Although these proceedings began in 1977, the relevant statutory provisions have not been changed since the date of the hearing.

2. Section 367.107.2(2) provides no bank or trust company may maintain or operate "a facility *outside the limits* of the *city, town* or *village* or *unincorporated community* in which

its banking house is located *nor outside the county* in which the bank or trust company's banking house is located, even if the limits of such *city, town, village* or *unincorporated community* extend across county lines, except as otherwise provided by law; . . ." (Emphasis added).

named exceptions) within *400 feet of* an existing competitor bank. Notwithstanding this closely drawn statute evincing the clear legislative intent to prevent branch banking, the Board, in a thinly veiled move to destroy the restrictions against branch banking, erroneously interpreted (an error now compounded by the majority), the words "unincorporated community" of § 362.107.2(2) to mean "banking community." It then found the proposed facility site was within the "banking community" where the main Gravois Bank was located. This misinterpretation of that statutory phrase appears in the following findings of fact and conclusions of the Board:

" . . . Findings of Fact . . .

"(d) Gravois Bank was chartered in 1913. Of its nine initial directors, four came from the Sappington area. From and after the time of incorporation, Gravois Bank was the only bank located on Gravois Road between Grand Avenue in the City of St. Louis and the City of Fenton, located south of the Meramec River. From the time of its organization, many of the farming families and merchants in the area along Gravois Road in St. Louis County patronized the bank. The evidence presented to the Board shows that substantial numbers of persons in the unincorporated areas of Affton and Sappington along Gravois Road maintain deposit and loan accounts at the Gravois Bank. These accounts are substantially greater in dollar amount than accounts maintained with Gravois Bank by residents of the Lemay area which is geographically much closer to Gravois Bank and its existing facility. The banking habits of the residents of the Affton and Sappington areas suggest the *existence of a community for banking purposes*. . . .

"(h) The Bank of Crestwood was incorporated in 1958. For over forty years prior to the incorporation of that bank, the Gravois Bank had served the Gravois Road community of people including both

the Affton and Sappington areas. The relative proximity of the two locations and the substantial number of accounts representing people who have relied upon the Gravois Bank for banking services in the Sappington area lead the Board to believe that an unnecessarily restrictive interpretation of the term 'community' would render a disservice to the people who have been served by the Gravois Bank. Since the only issue before the Banking Board, by stipulation, is the interpretation of the term 'community,' it is clear that an interpretation *which allows the Gravois Bank to continue to serve its customers in the Sappington area will contribute to the convenience and needs of the community which Gravois Bank has served and will continue to serve.*

"*CONCLUSIONS OF LAW*

"1. The judicial precedents to which the Board has been referred by counsel indicate that the legal concept of 'community' is a broad and flexible one and one which changes shape depending upon the purposes for which the term is applied.

"2. The law under which the Commissioner of Finance approved the facility for Gravois Bank, Section 362.107, *was designed to increase the convenience of banking services to the general public. It is the duty of the Banking Board to implement this statutory policy in its decisions.*

"3. The residents and businesses along Gravois Road surrounding the main banking house of the Gravois Bank and the proposed facility site of the Gravois Bank *share a sufficient community of interests* to constitute that area a single unincorporated community within the meaning of Section 362.107. . . ." (Emphasis supplied).[3]

Examining the statutory term "unincorporated community," I find no Missouri cases construing that phrase, and decisions of other jurisdictions stem from different

3. At the meeting in which the Board delivered its decision, each member of the Board gave his reasons for his decision. These oral expres-

sions reinforce the conclusion that "banking community" was the standard utilized by the Board.

statutory schemes.[4] However, for reasons now discussed, I believe the statutory limitations prohibiting placement of a facility outside the [1] *city*, [2] *town*, [3] *village* or [4] *unincorporated community* in which the main banking house is located, are locational limitations denoting geographic boundaries. The legislature has absolutely restricted placement of a facility to an area [1] within the bounds of the county, and, further [2] within the bounds of a municipal subdivision (city, town, village) or if in an unincorporated portion of the county, then within a community having an identifiable area whose community characteristics resemble those of a municipality.

The entities, [1] city, [2] town, [3] village or [4] unincorporated community, approved by the legislature as locations for a facility fall in the same category, i. e., municipalities, incorporated or otherwise, with characteristics common to such bodies. Ignoring this obvious legislative pattern, the board erroneously isolated the fourth named entity and, cutting it from its place in the statute's sentence artificially assigned to it a meaning foreign to the sentence of which it is a part. The board and now the majority have in effect substituted the word "*banking community*" for the words "*unincorporated community*". In its effort to justify this statutory surgery, the majority pays lip service to the doctrine of *pari materia*, but then does violence to that tenet by blandly ignoring the remaining portion of the sentence from which the phrase is plucked. The majority refuses to read the four serially arranged limitations on branch banking of Section 362.107.2(2), in "*pari materia*". If the term "banking community" were intended, the legislature would have used the term instead of "unincorporated community". The legislature, of course, did not so do realizing that if "banking community" was to be the standard, the boundaries could be as far flung as the area in which any of the bank's customers could be found in the county. In addition, that fourth type community appearing seriatim with the three first named is clearly intended to complement and round out the series of which it is a part. The familiar rule of construction *ejusdem generis* (of the same kind, class or nature), ignored by the majority, is helpful here. It suggests that in a statute enumerating particular classes followed by general terms. The general terms will be considered applicable only to things of the same general character as those specified. *See, State v. Lancaster*, 506 S.W.2d 403 (Mo.1974). Hence, general words following enumerated words of specific meaning are not to be construed in the loosest possible sense nor by selecting a meaning outside or foreign to the series of which the term is a part, but instead in a manner consistent to the class of which it is a part. *See*, Black's Law Dictionary, Fourth Edition. While the rule is not an absolute, it provides an aid to construction and in this instance, the statute as a whole supports the doctrine's application.

In sum, subsection 362.107.2(2) restricts the geographical area in which facilities may be located, to four types of entities in the general category of "municipalities", with a purpose of limiting boundaries geographically of such "municipalities". The existence and boundaries of such municipalities are quite unrelated to banking custom,

---

4. Respondents rely particularly upon *Upper Darby National Bank v. Myers*, 386 Pa. 12, 124 A.2d 116 (1956). There the words "other community" were not used in a restrictive sense but *within the framework of need for banking services.* That case is similar to the decision in *Central Bank of Clayton v. State Banking Board of Missouri*, 509 S.W.2d 175 (Mo.App. 1974), which interpreted the "community and area" convenience and need standard under Subsection 3 of § 362.107. While the tests of Subsection 3 require a discretionary determination based upon banking considerations, the restrictions of Subsection 2 of § 362.107 control in the case *sub judice* and are absolute, not subject to discretion on the basis of banking need and convenience or similar banking institution considerations. *Citizens National Bank v. Commonwealth*, 214 Va. 372, 200 S.E.2d 535 (1973), also cited, is similar to *Upper Darby, supra.* More nearly in point is *Union Savings Bank of Patchogue v. Saxon*, 335 F.2d 718 (D.C. Cir.1964), holding that a restriction limiting branch banks to a city or village, including an "unincorporated village," was not met by an area having the requisite territory and population to be incorporated as a village *but lacking the characteristics of a village.*

notwithstanding the majority's arbitrary lifting of the term from context. The statute should not be so judicially amended. Banking patterns are not the basis for the identification of existence or geographic limits of a city, town, village or unincorporated community. In sum, I submit the legislature intended that a banking facility could be placed only in the municipality where the parent bank was located and such "municipality" necessarily includes the fourth named entity set forth in the statute's sentence. That the term unincorporated community must be viewed in the same manner, and to qualify as a facility site the location must be in an established community with traditional municipal characteristics (except formal incorporation), having geographically identifiable limits. Obviously such an entity will not have the same precision of boundaries found in a city, town or village, but as noted above, those limits are determined by geographical considerations which mark the unincorporated area as a community similar to a city, town or village, not banking patterns. *See, Petition to Incorporate the City of Duquesne,* 322 S.W.2d 857 (Mo.1959), and *State ex rel. City of Perryville v. Pickle,* 564 S.W.2d 905 (Mo. banc 1978), for general guidelines as to what constitutes a city, town or village.

The statutory theme presents a ban on branch banking with narrowly drawn exceptions created to allow banking service for persons coming by automobile. The General Assembly recognized that the physical location of established banking houses in many communities prevented development of an automobile facility attached or adjacent to the main banking house. *See,* Laws, 1959, H.B. 568, Sec. 1, Purpose of the Act. Clearly the legislative intent was to limit the creation of such facilities and to restrict them to an area closely proximate to the bank. The original act imposed both the restriction of city, town, village or unincorporated community and a 1,000 yard lim-

it. Laws 1959, H.B. 568, Sec. 2. The distance restriction was increased to 4,000 yards and eventually eliminated. Laws 1971–72, S.B. 146, p. 349, H.B. 1062, p. 973. By removing the "distance" limitation but continuing the "municipality" restriction, the legislature considered the latter sufficiently territorially restrictive to obviate the perceived dangers of branch banking.

Finally, the positioning of the phrase *unincorporated community* in subsection 2 of the statute (§ 367.107.2(2) rather than subsection 3) is significant to this analysis. It is located with other absolute geographic prohibitions of subsection 2, not in the discretionary review sections of subsection 3, and before an application for a facility can be approved, it must first meet the geographic requirements of subsection 2. Only after it has passed muster as to the geographic limitations requirement may the board consider the qualities of the application under the terms of subsection 3. Without question the testing as to the geographic limitations under subsection 2 do not require application of the board's banking expertise. In contrast, subsection 3, coming into play after the application is found to qualify under subsection 2, does call for consideration of banking principals. That subsection provides that the director of finance (on appeal the Board) shall determine the convenience needs and welfare of the people of the "*community and area*" served. But even there the General Assembly indicates that the *community* served was different than the *area* served which reinforces my analysis that subsection 2 refers to communities, municipal in character, while subsection 3 refers to banking *areas*.[5] In addition, the Board's interpretation, adopted now by the majority, virtually removes the limitations on facility location by a bank such as Gravois whose main house lies in an unincorporated area, but the restrictions remain on a nearby bank such as Crestwood which happens to be located in a

---

**5.** It is also interesting that Section 362.108 applicable to second, third and fourth class counties utilizes the phrase "incorporated or unincorporated town" and places a population limit

on the size "town" in which a facility can be located a usage indicating that there too the unincorporated entity is equated as nearly as possible with an incorporated entity.

city (town or village). I do not believe the statutory scheme envisioned such disparity of treatment based solely upon the physical location of the main bank. If we are to remake the statute in the manner suggested by the majority, we should be consistent and construe the language of the sentence to read:

No bank or trust company may maintain or operate a facility outside the limits of a [banking] city, [banking] town or [banking] village or unincorporated [banking] community in which its banking house is located, nor outside the county in which the bank or trust company's banking house is located, even if the limits of such [banking] city, [banking] town, [banking] village or unincorporated [banking] community extend across county lines.

For these reasons I would hold that the Board erred in its determination that the phrase "unincorporated community" means "banking community" rather than a geographical entity bearing the characteristics of a city, town or village.

Had the decision required the exercise of broad discretion, the proper course would be to remand for further proceedings, § 536.-140.5; however, when as here the agency action involves only misapplication of the law to the facts, the posture of the case is such that we may weigh the evidence and determine the facts accordingly. In so doing this Court should give due weight to the opportunity of the agency to observe the witnesses and in so far as appropriate, to the agency's expertise and experience. Sec. 536.140.3; *Missouri Church of Scientology v. State Tax Commission*, 560 S.W.2d 837 (Mo. banc 1977), *appeal dismissed*, 439 U.S. 803, 99 S.Ct. 57, 58 L.Ed.2d 95 (1978).

If the main banking house and the facility are not located in the same *unincorporated community*, then no authority to operate the facility may issue regardless of the needs, convenience and welfare of the public or the advantages or disadvantages to the bank or its competitors. The evidence in this case was predominantly documentary and largely uncontradicted. It is the conclusion to be drawn from those facts which is disputed, involving only a determination of the limits of an unincorporated community, which as noted above does not call for an exercise of the board's banking expertise. Therefore, it is appropriate to now determine whether the bank and proposed facility are in the same "unincorporated community."

A review of the evidence reveals that Affton and Sappington evolved from separate large holdings of land by the Mackenzie and Sappington families. The Mackenzie holdings were in the Affton area—Mackenzie and Gravois Roads—; the Sappington holdings in the Sappington area—Sappington and Gravois Roads. These holdings eventually devolved into truck gardens, and finally into residential development. The area around Gravois—Mackenzie became known as Aff's Town (later Affton) after a merchant who maintained a post office there. Several miles to the west the area around Sappington—Gravois became known as Sappington and included a post office in Wohlschlaeger's Store. Each had a small commercial area. In the 1930's, Affton became incorporated and shortly thereafter disincorporated. The incorporated limits on the east began at the city limits of St. Louis, and extended west to slightly west of Mackenzie and were located both north and south of Gravois Road. They did not reach even to Gravois Creek. Gravois Creek and its flood plain constitute a natural and traditional barrier between the Affton area and the Sappington area. This barrier is reinforced by the Missouri Pacific railroad tracks and Grant Road which parallel the creek. Immediately to the west of those barriers lie Grant's Farm abutting Gravois Road to the north and B & B horse farm abutting Gravois Road to the south. To the east of the Gravois Creek and abutting Gravois Road on the south is a large cemetery—Sunset Burial Park. To the south of B & B Farms across Tesson Ferry Road lies Greenpark Park. The effect of these various large tracts of established, largely undeveloped land holdings is to create an additional barrier between the two areas nearly four miles in width and be-

tween ¼ mile to 1 mile in depth. From Gravois Road, south to Tesson Ferry Road, a distance of a little less than a mile, and from Gravois Road north to Pardee, a distance of slightly over a mile there are no streets or roads connecting the areas east of Gravois Creek with those west of the creek. For a distance of approximately five miles from I–55 to the south to Watson on the north, no residential streets connect the two areas. An incorporated community—Grantwood Park—lies between the two areas north of Gravois, and the incorporated community of Lakeshire lies between the two areas south of Sunset Burial Park.

There is a branch post office located in Grasso Plaza, east of Gravois Creek at Rock Hill Road and Gravois Road, called the Affton Branch Post Office. There is a post office branch west of Gravois Creek on Gravois Road across from the proposed facility called the Sappington Branch Post Office. Affton and Sappington are each delineated by the Census Bureau as "designated places" for census purposes. Designated places are unincorporated areas from which information is collected as it is from incorporated entities. Since the 1940 census the Bureau of the Census has defined boundaries for places that have no legal limits. Originally these were called "unincorporated places" but for the 1980 Census are called "Census designated places." The criteria for determining such places, while not binding on this court, are instructive in determining what an unincorporated community is. Those general criteria are as follows:

> "Generally, a proposed census designated place should be a densely settled population center which does not have legally defined municipal boundaries or corporate powers. It should contain a dense, city-type street pattern and ideally should have an overall population density of at least 1000 persons per square mile. It is recognized, however, that this population density cannot always be maintained because the selection of visible boundaries may require the inclusion of 'rural' area within the C.D.P.

> "In addition, a C.D.P. should be a community that can be identified locally by its own place name, and which has developed over the years from a small commercial area or market center, rather than being a subdivision, apartment development, or general urban expansion area."

The best three physical features for determining the boundaries of a census designated place are: (1) street features, (2) water bodies including streams, and (3) railroad tracks. As mentioned, both Affton and Sappington are treated as census designated places by the Census Bureau. Additionally, Concord Village, lying between the two is also a census designated place.

Both the Affton and Sappington areas contain a large number of commercial establishments of the types found in most cities, towns, or villages. These establishments provide the types of goods and services required on any everyday basis by residents of the area, such as hardware, drugs, food, beauty and barber care, etc. These goods and services are fully provided in both areas. Many of the commercial establishments in Affton use the name "Affton" as part of their business name. Many Sappington establishments use "Sappington" in their name. No business in the Affton area uses Sappington, and vice versa. Both Affton and Sappington are listed as separate places in the telephone directory under the listings for emergency services and for payment of utility bills. A telephone poll of a representative sample of persons living within the two census designated places reflected that the vast majority of residents of the Affton area stated they lived in Affton. A lesser but still substantial number of residents in the Sappington area identified their residence as Sappington. An insignificant number (1) of the people polled who lived in the Affton area stated they lived in Sappington. A similar insignificant number (1) of Sappington residents identified Affton as their residence.

In its application for the facility, Gravois described the location as "Sappington (unincorporated)" in the space delineated for "city or town." In its consolidated report

of condition on July 23, 1975, Gravois identified itself as "of Affton, Missouri." In January 1974, the Division of Finance of Missouri certified an increase of capital stock of "Gravois Bank, Affton, Missouri."

While no one of the matters set forth above *would* necessarily determine the question before us, the cumulative effect is overwhelming that Affton and Sappington are not the same "unincorporated community" within the meaning of the statute. There is not an identifiable community which includes both areas. The physical barriers between them, the absence of a network of residential streets connecting them, the absence of contiguous residential or commercial development, the historical growth and development as two separate areas, the identification by residents, businesses, and government as two separate communities, and Gravois' own recognition of two places identified by different names establishes them as two separate unincorporated communities. The evidence is less definite on the limits of Sappington or the area it covers, probably because its residential development has been more recent. Affton is a more established area and its limits more clearly defined. I would find those western limits do not reach beyond Gravois Creek. The proposed facility is not within those limits.

I have not overlooked the evidence of the social and economic similarity of the two areas. Such similarity is common throughout incorporated and unincorporated areas of St. Louis County and probably of most counties. Nor have I placed any reliance upon the various political, school, fire, police, and church boundaries which in some cases include both areas and in others do not. I agree in that respect with the Board's finding that "[t]his evidence leads the Board to conclude that each of such boundaries was drawn for reasons related to the purpose or objective of the political or social entity encompassed therein." I also reject Gravois' contention that all of southern St. Louis County is a single unincorporated community. The evidence does not establish that to be true nor would such a finding comport with the statute as I interpret it. While the area is heavily populated and contains much commercial and industrial development, the record reflects that the unincorporated portions of south St. Louis County have retained their own place and name identification. That the area could legally be incorporated as a city does not mean that it is to be treated as one for purposes of the statute.[6]

Gravois asserts that the finding I make here would cast doubts upon the propriety of facility authorizations previously made by the Board. However, I deal only with the case before us, and this Court is not bound by prior erroneous interpretations of law by the Board, if such interpretations have in fact heretofore been made.

Judgment of the trial court should be reversed and the cause remanded with directions to remand to the State Banking Board for denial of the certificate of authority to Gravois Bank for the establishment of a banking facility at 11659–85 Gravois Road.

---

**6.** The record reflects that a movement to incorporate much of south St. Louis County and parts of northern Jefferson County into the City of Meramec died for lack of support.